**CROSBIE et al. v. BREWER et al.**

No. 6685—Opinion Filed March 21, 1916.

On Rehearing Feb. 26, 1918.

(158 Pac. 388; 173 Pac. 441.)

**1. Guardian and Ward—Appointment—Jurisdiction.**

A ward acquiring a residence in another county during the interim between the removal of the guardian in the county where the guardianship matter was pending and before that court had appointed a new guardian does not operate to oust the county court of the latter county of its jurisdiction.

**2. Same.**

When a county court once lawfully acquires jurisdiction by the appointment of a guardian for a minor, this jurisdiction cannot be lost except in some prescribed orderly way.

**3. Same.**

When a county court once lawfully acquires jurisdiction in a guardianship matter, the jurisdiction of the court thereafter does not depend upon the duration of the tenure in office of the person appointed.

**4. Same—Appointment of Guardian—Notice.**

Upon the death, resignation, or removal of a guardian, the county judge can appoint a new guardian forthwith, without giving the notices required in the first instance.

**5. Same—Waiver of Right by Parents.**

The parents of the minor filed a written waiver of their right to be appointed guardian of said minor. On the day assigned for the court to appoint a guardian the said parents telegraphed a withdrawal of said waiver. Held, the court had a right to appoint another party as guardian, notwithstanding said telegraphic notice

**6. Same—Appointment of Guardian—Collateral Attack.**

The records of the county court of Pittsburg county showed every jurisdictional fact in the matter of the appointment of a guardian for a certain minor. Said guardian executed an oil lease upon the lands of the minor to C. & W. In an action for that purpose, C. & W. sought to defeat the payment of a check given for said oil lease upon the grounds that the appointment of said guardian was void for jurisdictional reasons. Held, a collateral attack and not permissible.

**7. Judgment—Proceedings to Vacate—"Direct Proceeding" — "Collateral Proceeding."**

Proceedings instituted for the purpose of destroying, impairing, or modifying the force or effect of a judgment for all cases, such as proceedings to reverse, vacate, set aside, declare void, suspend, modify, or perpetually enjoin a judgment, are "direct proceedings." But a proceeding instituted for some other purpose, and in which the question of the force or effect of the judgment arises only incidentally, is a "collateral proceeding."

**8. Contracts—Validity—Mutuality.**

In all contracts both parties are bound, or neither are. There must always be a mutuality in the contract, and it must be binding upon both parties, and it does not become binding until a proposition is made upon one side and accepted upon the other.

**9. Indians—Lease—Approval by Secretary of the Interior.**

(a) The Act of Congress of May 27, 1908 (35 Stat. L. 312, c. 199), does not confer on the Secretary of the Interior the right to enter into a lease contract affecting the restricted lands of a minor Indian. (b) That right rests solely in the guardian. (c) The only actual authority of the secretary in such cases is, either to approve the lease contract as made by the guardian, or to withhold his approval.

**10. Same.**

C. & W. entered into a contract with the guardian of a minor for an oil lease upon the restricted lands of said minor. Pending the action of the Secretary of the Interior thereon, the lessees could not voluntarily withdraw therefrom without the consent of said guardian, unless notified by the said secretary, or his agent, that the terms of his contract were rejected.

**11. Same.**

In payment of the bonus for an oil lease upon the restricted lands of an Indian minor, the lessees gave a certified check therefor to the guardian, payable upon the approval of said lease by the Secretary of the Interior within 60 days. This check was sent to the Indian superintendent, who, upon its receipt, wrote the lessees that in order for the lease

to receive favorable consideration they were required to pay the cash into his office. In reply thereto, the lessees wrote to said superintendent that they desired the application for the lease be disapproved and the check returned to them. Held, this communication of the superintendent was in effect notice of the refusal to approve the lease contract and a rejection of the same under its then terms, and that the lessees were thereby given the privilege of withdrawing from said contract, and, after so notifying the superintendent to that effect, were no longer bound thereby.

(Syllabus by Mathews, C.)

On Rehearing.

**12. Same.**

Act Cong. May 27, 1908, c. 199, 35 Stat. 312, authorizes the guardians of Indian minors to make certain lease contracts, subject to the approval of the Secretary of the Interior. Held, that, where a guardian, under proper probate procedure, made a lease contract under the provisions of this act, which was duly approved by the Secretary of the Interior, the lessee was bound by such contract.

Kane, J., dissenting.

Error from District Court, Tulsa, County; L. M. Poe, Judge.

Action by J. E. Crosbie and another against R. P. Brewer and others. Judgment for defendants, and plaintiffs bring error. On rehearing, affirmed, and cause remanded for further proceedings.

This action was begun on April 24, 1914, in the district court of Tulsa county by plaintiffs, in which they sought to enjoin the payment of a certain certified check given by plaintiffs to defendant Brewer, guardian for one Albert Carney, as a cash bonus for an oil lease upon a tract of land owned by the said Albert Carney.

The said Albert Carney was a full-blood Choctaw Indian minor. In 1906, one W. F. Maharry was appointed his guardian by the federal court sitting at Ardmore. After statehood the case was transferred to the county court of Carter county, of which Ardmore was the county seat, although the said Albert Carney was residing within the confines of what is now Pittsburg county. In 1909, upon petition therefor, the case was transferred to the county court of Pittsburg county, where the minor resided with his parents. On January 9, 1914, a petition was filed in the county court of Pittsburg county asking for the removal of the said Maharry as guardian. On January 30, 1914, an order was made removing Maharry, and on the 7th day of February, 1914, the said Maharry perfected his appeal therefrom to the district court. On February 4, 1914, defendant Brew-

er filed a petition in the county court of Pittsburg county for his appointment as guardian of said Albert Carney. On the filing of the petition, and on the same day, the county court made an order setting said petition for hearing on February 16, 1914, at 10 o'clock a. m., and directed the giving of notice thereof for 10 days by posting said notices in three public places in Pittsburg county, and the said notices were addressed to the relatives of the said minor residing in the county, and to any person having the care of said minor, and reciting that the said Brewer had made application for appointment as guardian of the said minor, and that the same would be heard on the 16th of February, 1914, at 10 o'clock a. m. The father and mother also filed in writing a waiver of their right to be appointed guardian and requested the appointment of the said Brewer.

The father of Albert Carney testified that on the 7th day of February, 1914, he went to Carter county for the purpose of procuring a house to move in with the intention of taking up his residence with his family in that county; that after spending a few days in Carter county he returned to Pittsburg county and remained there until the 14th or 15th of February, 1914, and on the 15th day of February, 1914, he returned to Ardmore, Carter county, accompanied by his wife, his son, Albert Carney, and some of the other children, with the intention of taking up his residence in Carter county; that he again returned to Pittsburg county on the 20th of February, 1914, to attend a funeral, and on his return to Carter county brought the remainder of his children back with him, and had been residing in Carter county ever since.

On February 16, 1914, about 8:20 a. m., the petition of Norris Carney and wife was filed in the county court of Carter county for the appointment of C. E. Fraley as guardian of Albert Carney, and at said time the said Fraley was so appointed, and immediately qualified as such.

On February 16, 1914, at 10 o'clock a. m., the county court of Pittsburg county appointed R. P. Brewer as the guardian of the said Albert Carney, and he at once qualified as such.

Immediately after the appointment of the guardian in Carter county, Norris Carney and wife sent the following telegrams:

"Ardmore, Oklahoma, 9:40 a. m. February 16th, 1914. Latham, Semple & Tucker, McAlester, Oklahoma. As attorneys for the Choctaws please see that nothing is done with reference to appointing guardian for Albert Carney and Agnes Carney here as I am now a resident of Carter county and guardians have been appointed here. [Signed] Norris Carney. Lucy Ann Carney."

"Ardmore, Oklahoma, 9:40 a. m. February 16th, 1914. Judge B. P. Hammond, County Judge, McAlester, Oklahoma. I withdraw waiver of right to be appointed guardian. I have changed my residence to Carter county, Oklahoma. Guardians for Albert Carney and Agnes Carney have been appointed by the county court of this county. [Signed] Norris Carney. Lucy Ann Carney."

On February 16, 1914, the district court of Pittsburg county, on motion of the attorney for the said Maharry, dismissed his appeal from the order of the county court discharging him as the guardian of Albert Carney.

On February 18, 1914, Brewer, as the guardian of Albert Carney, filed a petition in the county court of Pittsburg county for permission to lease the lands of Albert Carney for oil and gas, and an order was made on the same day granting such permission.

On February 24, 1914, at public outcry, the county judge of Pittsburg county sold the lease on said lands to plaintiffs for a bonus of $18,150, and one-eighth royalty on oil, and on the same date confirmed said sale and approved the lease. This lease, covering as it did restricted lands of a full-blood Indian allottee, to be valid required the approval of the Secretary of the Interior under the provision of section 2 of the Act of Congress of May 27, 1908; hence it was upon departmental form, and the lessees in payment of the bonus issued their certified check dated February 25, 1914, payable to R. P. Brewer guardian of said minor and indorsed on it the following:

"This check not to be negotiated until after the approval of this lease by the Secretary of the Interior, which approval must be within sixty days from the date hereof, and if not so approved this check to be returned to the Central National Bank, Tulsa, Oklahoma. $18,150.00 (in the amount column.)"

There was also afterwards indorsed upon said check by R. P. Brewer the following statement:

"Pay to the order of W. M. Baker, Cashier Union Agency, Muskogee, Oklahoma. [Signed] R. P. Brewer, Guardian of Albert Carney."

On March 19, 1914, plaintiffs filed the lease with their application for its approval with the Union Indian Agency at Muskogee.

On March 21, 1914, the following letter was written by D. H. Kelsey, United States Indian superintendent, to plaintiffs:

"Referring to oil and gas mining lease executed by R. P. Brewer, guardian of Albert Carney, in your favor, received at this office on the 19th inst., and in connection with which you have agreed to pay to lessor, in the event your lease is approved, the sum of $18,150.00 as bonus for said lease, you are advised that this office is in receipt of a copy of telegram sent by the Central National Bank of Tulsa, to R. P. Brewer, cashier of the First National Bank at McAlester, which reads as follows: 'Crosbie and Wrightsman are forwarding through us certified check in favor of R. P. Brewer, guardian of Albert Carney, for eighteen thousand one hundred and fifty dollars to be paid in cash to you on approval by the Secretary of Interior of oil and gas lease covering thirty acres, said lease must be approved within sixty days from date.'

"From the above I would infer that this money has not been paid to R. P. Brewer, as guardian, but that it has been placed in the bank in escrow, to be returned to you in event your lease is not approved within sixty days from the date of the execution thereof.

"However, there is nothing to show in the lease itself, or from court orders, or other papers accompanying the same, that your offer was to hold good only in the event your lease was approved in sixty days. Inasmuch as you have consumed twenty days in the execution of your lease, same having been executed February 27, 1914, filed March 19, 1914, it is not thought probable, owing to the fact that a conflicting lease had been filed, executed by C. E. Farley as guardian of Albert Carney, to Jake L. Hamon, that your lease could be submitted to the department and approved in sixty days from the date thereof, provided it was found your claims were superior to those of Jake L. Hamon, lessee under the prior lease.

"The matter of guardianship presents a legal problem which may require court action and decision and this office must carry on an investigation to determine the facts in the case, all of which will consume time.

"As to the matter of bonus, it is the practice to require the lessee to pay into this office any bonus consideration which by agreement is to be paid the lessor as a consideration for the execution of the lease, which bonus consideration will be disbursed to the lessor only in the event the lease is approved by the department.

"In conformity with the practice, you will be required to pay into this office the amount of bonus agreed upon before your lease can receive favorable consideration.

"I wish you to inform me by return mail if you intend to prescribe a time limit within which your lease must be approved by the Department if your offer is to hold good, and if it is your intention to pay into this office at once the bonus consideration agreed upon, so that I may determine the action to be taken in the premises."

In reply to this letter, on March 31, 1914, plaintiffs wrote to the said superintendent as follows:

"Referring to your recent letter to Messrs. Crosbie and Wrightman, in reference to the above matter, in which you stated that as soon as the $18,150.00 bonus for the above lease was deposited with your department, that you would set the matter of the approval of the lease arising on account of conflicting lease, down for hearing. We beg to say that in view of the conflict in this title, and of the fact that the decision of the question by your department will not be final, and that the matter will have to be litigated in the state court before the title can be cleared, and since our agreement in taking the lease was that the approval should be within sixty days, and it was contemplated that the title to the property conveyed to us should be good, it seems that it will be utterly impossible to get approval by the department and clear the title to this property within the sixty days limit. Under these circumstances we do not care to lengthen the time in which we were to acquire the property, and therefore desire that the application for the approval of the lease be disallowed, and the check to R. P. Brewer, guardian, of date February 25, 1914, in the sum of $18,150.00, bonus on this lease, which was put in escrow, but has been transfered to you, be returned to us."

On April 2, 1914, the said Dana H. Kelsey replied to the aforesaid letter as follows:

"Messrs. J. E. Crosbie & C. J. Wrightsman, Tulsa, Oklahoma—Gentlemen: Receipt is acknowledged of your letter of the 31st ultimo requesting that the application for the approval of lease No. 29561 executed by R. P. Brewer, guardian of Albert Carney, minor, be disallowed, and the check to the guardian, dated February 25, 1914, in the sum of $18,-150.00 representing the amount of bonus which you had agreed to pay for this lease, provided same was approved within sixty days, be returned to you.

"In reply you are advised that Mr. Brewer, the guardian, has entered protest with this office against the disapproval of this lease and the return of the check above referred to. He has also requested that this matter be set down for hearing in order to determine the right of the conflicting lessees, so that your lease may be forwarded to the Department for approval within the time limit prescribed by you."

On April 17, 1914, the lease was forwarded by the said Kelsey to the office of the Department of the Interior at Washington, D. C., with his recommendation that it be approved.

On April 20, 1914, it was submitted by the Assistant Commissioner to the Secretary of the Interior with his recommendation that it be approved, and the lease was duly ap-

proved by the Secretary of the Interior; but the date of his approval is not shown.

Further facts will be set out in the opinion.

C. G. Hornor, John Devereux, and Dillard & Blake, for plaintiffs in error.

Latham & Tucker, E. P. Hill, L. K. Pounders, D. H. Linebaugh, and W. P. Z. German, for defendants in error.

Opinion by MATHEWS, C. (after stating the facts as above). The cause was tried to the court, who found for the defendants, and plaintiffs prosecute this appeal.

The first contention of plaintiffs for consideration is that when Norris Carney and wife established their residence in Carter county, on the 15th day of February, 1914, and having with them as a member of their family their child, Albert Carney, as there was no guardian for the said Albert Carney holding by appointment from the county court of Pittsburg county at that time, the guardian having been removed previous to that date, on and after his residence was established in Carter county, the county court of Carter county only then had jurisdiction to appoint a guardian for him, and that the appointment of a guardian on that date in Pittsburg county was without authority and void, and that the guardian so appointed by the county court of Pittsburg county had no right or authority to execute a lease on the lands of the said Albert Carney, and for that reason the draft in controversy, given the said Brewer by the plaintiffs for a lease upon the said lands of the said Albert Carney, was without consideration. To meet this proposition the defendants argue: (1) That the county court of Pittsburg county, and it only, had jurisdiction of the guardianship of the said Albert Carney on February 16, 1914, when the defendant Brewer was appointed his guardian by the county court of Pittsburg county; and (2) that, as the records of the county court of Pittsburg county show every jurisdictional fact, the attack sought to be made on the appointment of R. P. Brewer by the county court of Pittsburg county is a collateral attack and not permissible.

The issues upon this proposition, as well as others following, are sharply drawn and have been ably briefed upon both sides.

The exact question presented in the first proposition—that is, whether or not a ward acquiring a residence in another county during the interim of the removal of the guardian in the county where the guardianship was pending and before that court had appointed a new guardian operates to oust

the county court of the latter county of its jurisdiction—seems to be practically an original one, and we have been unable to find a blanket case where any court has passed directly upon the proposition, except our own court, in the case of Eaves v. Mullen, 25 Okla. 679, 107 Pac. 433, in an obiter dictum way, seems to have answered the proposition in the affirmative. In that case, prior to statehood, the federal court, sitting at Ardmore, had appointed a guardian for a certain minor. After statehood, that section where the minor resided was included in Johnston county, and Carter county, under the terms of the Enabling Act, took over the guardianship case then pending in the federal court. The guardian appointed by the federal court continued to act after the county court of Carter county acquired jurisdiction, and under its direction sold some of the land of said minor. The controversy in that case arose over whether or not that court had jurisdiction to make a valid sale of said minor's land, he being at all times a resident of Johnston county, and it held that the county court of Carter county had such jurisdiction. But the court went further and, while the question was not before him and should not have been decided, made this observation:

"Had the application of F. A. Bonner for appointment as guardian been made subsequent to the admission of the state, then only the county court of Johnston county would have had jurisdiction to entertain same, and should his guardianship now pending in Carter county for any reason be terminated as by death, resignation, or removal, then the appointment of a new guardian would be required, and the new proceeding would in no way be controlled by the foregoing provisions of the enabling act and of the Constitution, but would have to be instituted in the county in which the minors have their domicile. Harding v. Weld, 128 Mass. 587."

It will be noted that he based his conclusion on the above-cited case of Harding v. Weld.

We take the following note from Fuller's Massachusetts Probate Laws, p. 216:

"The death, removal, or resignation of the guardian terminates the graudianship, and, where a successor is to be appointed, it must be in the county where the ward resides when such new appointment is made, and upon notice the same as would be required in original guardianship. Allis v. Morton, 4 Gray [Mass.] 63; Harding v. Weld, 128 Mass. 587; Willwerth v. Leonard, 156 Mass. 277 [31 N. E. 299]."

This requirement of new notices upo the death, resignation, or removal of the guardian before another can be appointed, is in

direct conflict with the decisions of our courts. In the case of. the Guardianship of Chambers, 46 Okla. 139, 148 Pac. 148, appears the following:

"Where the guardian of the estate of a minor is properly appointed in the first place, the court acquires jurisdiction to administer its estate. and may, upon the removal of said guardian, under section 6578, Revised Laws 1910, appoint a successor, without notice, under said section."

It appears that in Massachusetts the domicile of the ward follows that of the guardian and determines the forum in which proceedings with reference to the guardianship must be had, including the appointment of a new guardian after his death, resignation, or removal. But this is against the general rule, which is that the guardian continues to be under the jurisdiction of the court in which the original jurisdiction to appoint was vested, no matter where the ward may reside. Woerner's Law of Guardianship, § 27.

The Massachusetts law as to the removal of guardians and appointment of their successors is as follows:

"If a guardian, appointed either by a testator or by the court, becomes insane or otherwise incapable of discharging his trust, or is unsuitable therefor, the probate court, after notice to him and to all other persons interested, may remove him. Upon the request of a guardian, the probate court may in its discretion allow him to resign his trust. Upon such removal or resignation, and upon the death of a guardian, another may be appointed in his stead." Fuller's Probate Law, p. 215.

The law of this state upon the same subject is as follows:

"6578. Removal or Resignation of Guardian. When a guardian appointed either by the testator of the county court or judge, becomes insane or otherwise incapable of discharging his trust, or unsuitable therefor, or has wasted or mismanaged the estate, or failed for thirty days to render an account or make a return, the county court may, upon such notice to the guardian as the court may require, remove him and compel him to surrender the estate of the ward to the person found to be lawfully entitled thereto. Every guardian may resign when it appears proper to allow the same; and upon the resignation or removal of a guardian, as herein provided, the county court may appoint another in the place of the guardian who has resigned or has been removed." In re Guardianship of Chambers, 46 Okla. 139, 148 Pac. 149.

From a comparison of the two foregoing statutes it will be noted that they are quite similar, yet from the Massachusetts statute the courts of the state have decided that, upon a vacancy occurring in the guardianship, the matter is terminated, and in order to have a new guardian appointed it is necessary to begin anew as if no guardian had been appointed in the first place, while our court, in the Chambers Case, takes the much more reasonable view that the court did not lose its jurisdiction merely because the guardian had been removed, but the jurisdiction was retained and another guardian could be appointed even without notice to any one.

Quoting further from the Chambers Case, supra :

"The last contention made by the former guardian is that the county court had no right, upon his removal, to appoint a new guardian, without notice. With this contention we cannot agree. The latter part of section 6578, supra, authorizes the county court, upon the removal of a guardian, for the causes set forth therein, to appoint a successor. No provision is made for notice; in fact, none is necessary, because, in the appointment of the former guardian, the court acquired jurisdiction, assuming that proper notice was given, as required by the statute, for the appointment of the guardian in the first place. There is no contention made here that the former guardian was not properly appointed. Section 6522, Revised Laws 1910, being the same as section 5472, Snyder's Compiled Laws 1909, with reference to the notice to be given in the appointment of guardians, has reference to the appointment in the first place, and, if this section is complied with, the court acquires jurisdiction. Then in the proper administration of the estate of the ward, if the court feels that the guardian should be removed and a successor appointed, notice is not a prerequisite to the right of the court to make the appointment."

It appears to us that, when the proper notices have been once given relative to the appointment of a guardian for a resident minor and the guardian actually appointed, the court acquires complete and exclusive jurisdiction, and the only way jurisdiction once acquired may be changed to another jurisdiction is the procedure provided by section 6198, Revised Laws 1910, which reads as follows:

"In any case where it is shown to the court that the domicile of a minor or ward has been changed from the county where the guardianship is pending to another county in this state, the guardianship may, upon application verified by oath, after notice has been given to the next of kin of such minor or ward and upon good cause shown, be removed to such other county. which would be the proper venue, in the manner and upon the conditions prescribed in the second preceding section for the transfer of suits, matters or proceedings if the court finds that

the domicile of the minor or ward has been changed in good faith, and that such transfer would be for the best interest of such minor or ward."

We find the following statement in 11 Cyc. at page 690:

"But where the jurisdiction of a court is exclusive and has once lawfully attached it cannot be ousted by subsequent events or facts arising in the cause, but the court may proceed to final judgment unless some constitutional statute operates to divest that particular court of its jurisdiction."

In the case of Randall et al. v. Wadsworth, 130 Ala. 633, 31 South. 555, it is said:

"Another question discussed by counsel is that of the jurisdiction of the court in granting letters of guardianship to Wadsworth as the successor of Powell. That the jurisdiction of the court attached, and rightfully so, in the grant of letters of guardianship to Powell, is not questioned. The court having thus acquired jurisdiction, the fact of the removal of the guardian to another county, carrying with him his ward, does not terminate the jurisdiction. The domicile of the ward was that of his father at the time of his death, and this domicile could not be changed by the mere act of the guardian so as to defeat the jurisdiction which was acquired before such removal. The statute provides the only way in which the jurisdiction, once acquired, may be changed to that of a different county."

We take the following from the case of In re Guardianship of Arva and Elmer Brady, 10 Idaho, 366, 79 Pac. 75:

"There is no doubt but that when the wards were domiciled within this state, and their only property, these insurance policies, were within the state, the probate court had jurisdiction to appoint a general guardian and to direct and control his conduct as such guardian. After having made such appointment, the court retained jurisdiction for all purposes in connection therewith until his accounts are rendered and he is legally discharged."

"The probate court of a county in this state, having appointed a guardian for the person and estate of a minor, does not lose jurisdiction of such guardianship by the removal of the guardian from this state, and may compel the foreign administratrix of such guardian after his decease to account to said ward." Mary Netting v. Clara T. Strickland, Adm'r, et al., 18 Ohio Cir. Ct. R. 136; Dorr v. Davis, 76 Me. 301; Dorman v. Ogbourne, 16 Ala. 759; In re Crawford Estate, 4 Pa. Co. Ct. R. 507; Wackerle v. People, 65 Ill. App. 423.

In the case of Garrison v. Caroline Lyle, 38 Mo. App. 558, a question very similar to the one at bar was before that court, and we take the following syllabus therefrom:

"To have jurisdiction over the subject-matter of the estate of a minor, the probate court must have acquired jurisdiction over the person of the minor, for whom the curator was appointed, at the time of such appointment, by the minor's residing in the jurisdictional territory of the court, and such jurisdiction, having once attached, will continue until properly ousted; and the removal of such minor, by his guardian or curator (even if such curator be his father or mother from whom the estate is not derived), within the jurisdiction of another court, does not oust the court of its jurisdiction, nor does such removal of the parent; and the court cannot, by nonaction in refusing to appoint a successor to a deceased guardian and curator, abdicate its jurisdiction." Marheineke v. Grothaus, 72 Mo. 204.

When one court has acquired jurisdiction, no other court of concurrent jurisdiction will interfere or attempt to assume jurisdiction of the same matter. Mail v. Maxwell et al., 107 Ill. 554. It is fundamental that the court which first acquires jurisdiction of the parties and subject-matter will retain it until divested of it by some court of appellate powers or the cause is regularly transferred in some way provided by statute. Any other procedure would lead to inextricable confusion and conflict.

If plaintiffs' contention upon the point under consideration was a correct version of the law, then we would have a situation where the jurisdiction of the court was ousted by the mere act of the party without any action whatever being taken by the court. We do not believe it was ever the intention for the court to lose jurisdiction of a case after it has once acquired the same except in some prescribed orderly way, and in order to meet the exact situation presented here, when the ward acquires a residence in another county, as it is claimed Albert Carney did, then there is a complete procedure for the removal of the guardianship prescribed by section 6198, Revised Laws 1910.

To invest the court with jurisdiction, the statutes require the filing of a petition for the appointment of a guardian (section 6522, Revised Laws 1910), and the same section requires the giving of such notices as the judge deems reasonable to the relatives of the minor in the county, and to any person having the care of the minor, and when the appointment of the guardian is formally made, if the minor resides in the county at that time, the court acquires jurisdiction, and the duration of the jurisdiction of the court thereafter in the matter of the guardianship of the minor does not depend upon the duration of the tenure in office of the person

appointed. The exercise of the jurisdiction of the court in a guardianship case grows out of the fact that the court has taken into its charge and subjected to its supervision the person and the estate of the minor. The court begins the exercise of its jurisdiction by the appointment of a guardian, and then in a legal way the court acquires actual jurisdiction, and, as said in the Chambers Case, when the statutory steps are complied with "the court acquires jurisdiction," and this jurisdiction continues until terminated according to law, and the acquiring of a residence in another county in the interim between the removal of one guardian and the appointment of another does not operate to terminate it; and so, following this rule, we hold that the jurisdiction of the county court of Pittsburg county continued to the exclusion of that of Carter county, and that the appointment of R. P. Brewer by the county court of Pittsburg county on the 16th day of February, 1914, was legal and regular.

In the discussion of the foregoing proposition we have assumed that the taking up of his residence in Carter county by Norris Carney and wife with their child, Albert Carney, was bona fide, although there is room for grave doubts upon that point, and the county court of Pittsburg county would have been sustained here should it have found expressly that such attempt to acquire a residence in Carter county was not in good faith; but such a question would become vital only where an application had been made under section 6198 to transfer the guardianship matter to another county.

On the 16th day of February, 1914, the attorney for appellant, Maharry, moved in the district court of Pittsburg county for the dismissal of the appeal taken from the order of the county court removing him as guardian of Albert Carney. Whereupon the court made the following order:

"It is therefore considered and ordered by the court that this cause be and the same is hereby dismissed, and the appeal herein is hereby dismissed, and said cause is hereby remanded to the county court of Pittsburg county, Okla., with instructions, for said c ourt to proceed in accordance with the judgment and order of this court."

It is plainly apparent that the order dismissing the cause was inadvertently made and could not have been intended, because it is followed by an order dismissing the appeal, and following that is an order remanding the cause to the county court with instructions to proceed in accordance with the judgment and order of the court. If the court had in fact dismissed the cause and not

the appeal he would not have remanded it to the county court for any purpose.

Plaintiffs next contend that section 6522, Revised Laws 1910, requires written personal notice to be given to the relatives in the county. That part of the statute referred to reads as follows:

"Such appointment may be made on the petition of a relative or other person in behalf of such minor. Before making the appointment the judge must cause such notice as he deems reasonable to be given to the relatives of the minor residing in the county, and to any person having care of such minor."

In the case at bar the court caused three written notices to be posted up in three public places in the county, and plaintiffs argue that this was only constructive notice and was not the notice intended by the above statute. It seems it was the intention of the law to leave the nature of the notice to the discretion of the county judge, and the only notice required to be given was one deemed reasonable by the judge.

The plaintiffs further attack the petition filed by Brewer for appointment as the guardian of Albert Carney upon the ground that it did not contain the names of the relatives residing in the county to whom notice should be given. It is a sufficient answer to this objection, as well as the one preceding, that this court has held in the Chambers Case, supra, that the court has the power to appoint a successor to a removed guardian, as in the case at bar, without giving any notice to any one.

At the time R. P. Brewer filed his petition for the appointment as guardian for Albert Carney, Norris Carney and wife filed a written waiver of their right to the appointment and requested the appointment of the said Brewer. On the 16th day of February, 1914, they telegraphed the county judge of Carter county the withdrawal of their waiver. Each of the parents knew that the county court of Pittsburg county had designated February 16, 1914, as the date when he would appoint a guardian for Albert Carney. If they desired to withdraw their waiver, it was their duty to have been present in person or by a representative and have submitted the matter properly to the court. The court was not required to take cognizance of a telegram sent him from a distant county to that effect, but he perhaps would not have appointed either should they have been present and requested such an appointment, because the court under the statute has a discretion in the matter and can refuse to appoint the parents of the minor if he deems them incompetent (section 6530, Revised Laws 1910),

and in this case no doubt the incompetency of the parents would have been conceded; it being so apparent.

As to the second proposition urged by defendants, that the attack which plaintiffs make against the appointment of R. P. Brewer as the guardian of Albert Car..cy is a collateral one, we are of the opinion that it, also, is well taken. It would extend this opinion unnecessarily to discuss this proposition at length. Neither do we deem it necessary, as our own court has passed upon this exact question sustaining defendants' contention in three well-considered opinions by Justice Turner.

In the case of Hathaway v. Hoffman, 53 Okla. 72, 153 Pac. 181 a suit in ejectment was instituted in the district court of Coal county by several minors through their guardian, when these facts were presented: In August, 1908, Elzie Harper died in Atoka county, leaving surviving him his wife and several minor children, and owning the land in question located in Coal county. In December, 1908, his widow married again, and in January, 1909, the mother, with her husband and said minors, moved from Atoka county to Coal county. A resident of Atoka county was appointed guardian of said minors by the county court of Atoka county, and thereafter by order of that court, sold and conveyed the land in controversy by a guardian's deed. The suit was based upon the claim that the appointment of the guardian by the county court of Atoka county, while the minors were residents of Coal county, was void because the court of Atoka county was without jurisdiction to make it. In the opinion rendered by Judge Turner it was held:

"The record of the county court of Atoka county being silent as to the factum of the residence of the minors at the time said appointment was made, and the court being one of general jurisdiction as to matters probate, the trial court did right in passing on the motion to direct a verdict, to lay out of the case said evidence as to the residence of the minors at the time the appointment was made, and hold, as he did, in effect, that such was a collateral attack on the record of that court, which, importing as it does absolute verity, was not subject to be impeached by evidence aliunde. In Clinton Nat. Bank v. McKennon, 26 Okla. 836, 110 Pac. 649, we said: 'It is the duty of the court in directing a verdict to lay out of consideration incompetent testimony received over objection.'

"The record of the county court being silent as to the residence of these minors at the time this appointment was made, it is but fair to presume, in aid of the jurisdiction of the court to make the appointment, that the court before making it took evidence, as was its duty to do, and found the facts to be that their residence at that time was in Atoka county.

"* * * In aid of the presumption of the jurisdiction of the county court to make the appointment, we will presume the court not only heard, but passed upon, evidence of the same facts disclosed in this collateral attack, in effect, that, after the death of the father of these minors in Atoka county, their mother married again there, and the family as thus constituted took up their residence in Coal county; that they were living there at the time the appointment was made; and that thereupon the court held the law to be that the residence of these minors at that time was in Atoka county. And assuming, as is contended, that such was an erroneous decision of the jurisdictional fact of residence, it does not follow that the subsequent action of the court in exercising jurisdiction in making the appointment was an usurpation of jurisdiction where none existed, but at most was error to be corrected on appeal from the order of appointment, and cannot be declared void on collateral attack.

"* * * And plaintiffs' action is a collateral attack on the record of the county court in the matter of the appointment of Taubner as guardian and the subsequent proceedings therein resulting in the sale of the land in controversy. We say this for the reason that, primarily, the action is one in ejectment joined with one against certain parties defendant who claim an estate or interest in the land adverse to plaintiffs', for the purpose of determining such interest and canceling the evidences thereof as a cloud on plaintiffs' title pursuant to act approved January 25, 1911, which was not intended to authorize such attacks or to correct such proceedings. Being compelled to recover, if at all, on the strength of their own title, the burden was on plaintiffs to prove title in themselves, for it is settled that title in the plaintiff is essential to a recovery both in and action in ejectment and to remove a cloud. Lewis v. Clements, 21 Okla. 167, 95 Pac. 769. In attempting so to do, the record of the county court arose incidentally, whereupon they assailed it and sought to avoid its force and effect in the manner stated, recognizing the fact that proof of title in themselves turned upon the question of the validity of the record assailed. We shall enter into no prolonged discussion to show that such was a collateral attack. It is sufficient to quote from Continental Gin Co. v. De Bard, 34 Okla. 66, 123 Pac. 159, where we said: 'A "direct attack" on a judicial proceeding is an attempt to avoid or correct it in some manner provided by law. A "collateral attack" on a judicial proceeding is an attempt to avoid, defeat or evade it, or deny its force and effect in some incidental proceeding not provided by law for the express purpose of attacking it.'"

The case of Baker v. Cureton, 49 Okla. 15, 150 Pac. 1090, was a cross-action to quiet

title. The facts were as follows: Defendant deraigned his title from the guardian, pursuant to guardianship proceedings in Wagoner county. Plaintiff deraigned his title by deed from the said minor, executed after he attained his majority. Plaintiff attacks the guardian's deed upon the claim that the records of the county court show on their face that no valid appointment of a guardian for the minor was ever made, in that it appeared upon the face of the record that letters of guardianship were issued without notice, and for that reason the appointment was void for want of jurisdiction to make it. In passing upon the question thus presented, the court said:

"Assuming that it was necessary to its validity that the judge gave notice of the appointment of Hawkins 'to any person having the care of Ballard' and 'to such relatives of the minor residing in the county as the judge may deem proper,' while it might be said from the face of the record that no such notice was given, can we not indulge the presumption from the fact of the appointment that the court heard evidence and found every fact necessary to justify the appointment? In other words, the county court of Wagoner county being a court of general jurisdiction as to probate matters (Eaves v. Mullen, 25 Okla. 679, 107 Pac. 433), and its records entitled to have accorded them the effect and legal presumption in favor of the validity of the appointment, it not appearing on the face of the record that Ballard had relatives residing in the county or was in the care of any one, can we not presume that, his father and mother being dead, he was in the care of no one and had no relatives living in the county, and that hence there was no one to whom the judge could give the notice prescribed by said section? We can and will: and hold that the record and proceedings of the county court cannot be collaterally attacked, as is here attempted, by evidence aliunde, in effect, that he was at the time in the care of some one, and had relatives residing in the county upon whom the notice should have been served." Baker v. Cureton, 69 Okla. 15, 150 Pac. 1090; Rice v. Theimer 45 Okla 618, 146 Pac. 702.

In 23 Cyc. 1062, 1063, it is said:

"The term 'collateral,' as used in this connection, is opposed to 'direct.' If an action or proceeding is brought for the very purpose of impeaching or overturning the judgment, it is a direct attack upon it. Such is a motion or other proceeding to vacate, annul, cancel, or set aside the judgment, or any proceeding to review it in an appellate court, whether by appeal, error, or certiorari, or a bill of review, or, under some circumstances, an action to quiet title. On the other hand, if the action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important, or even necessary to its success, then the attack upon the judgment is collateral."

In the case of Cohen v. Portland Lodge No. 142, etc. (C. C.) 144 Fed. 266, it is said:

"It should be stated, preliminarily, that the present suit is, in its nature and effect, a collateral attack upon the decree in the foreclosure suit. It does not purpose annulling or vacating such decree, but it proceeds upon the idea that, standing unreversed, with all the force it is entitled to under the law, it is not an impediment to plaintiff's obtaining the relief sought. Indeed, plaintiff concedes, by the very form of suit adopted, that it has some operative effect; for he says that the defendant has, by virtue thereof, been subrogated to the interests of the mortgagee. The true position of plaintiff, however, is that such decree as it now stands is void as to him, without any affirmative action of the court rendering it so, and that, so standing, it is not an impediment to his right to redeem. This is a collateral as contradistinguished from a direct attack upon such decree. Morrill v. Morrill, 20 Or. 96, 25 Pac. 362, 11 L. R. A. 155, 23 Am. St. Rep. 95."

"Proceedings instituted for the purpose of destroying, impairing, or modifying the force or effect of a judgment for all cases, such as proceedings to reverse, vacate, set aside, declare void, suspend, modify, or perpetually enjoin a judgment, are direct proceedings. But a proceeding instituted for some other purpose, and in which the question of the force or effect of the judgment arises only incidentally, is a collateral proceeding." Mastin v. Gray, 19 Kan. 458, 27 Am. Rep. 149.

In the case at bar, its object was to prevent the payment of the certified check given by the plaintiffs to defendant Brewer. The validity of Brewer's appointment as guardian for Albert Carney was merely incidental to the suit. Clear and concrete definitions of "direct" and "collateral" attacks are to be found in the case of Continental Gin Company v. De Bord, supra, and measured by that opinion most certainly the attack made on the appointment of Brewer is an attempt to avoid the same, not by a direct attack on the proceedings of the county court of Pittsburg county by a motion or other proceeding to vacate, annul, cancel, or set aside the order appointing him as said guardian, but is an attempt to evade its force and effect in a proceeding which has the independent purpose of preventing defendants Baker and Brewer from negotiating the check and the bank from paying the same when presented, and most evidently is a plain collateral attack. Plaintiffs' prayer to their petition leaves no room for argument, which reads as follows:

"Wherefore, plaintiffs sue and pray a writ of injunction enjoining and restraining said

W. M. Baker and said R. P. Brewer and each of them, from negotiating said check and enjoining the said Central National Bank from paying said check when presented, and plaintiffs further pray that said check may be adjudged to be null and void and of no effect, and that same be canceled."

In the order appointing Brewer guardian of said Albert Carney appears the following:

"And it appearing to the court that each of said minors is a resident of Pittsburg county, said state, and are in the care and custody of Norris Carney and Lucy Ann Carney, father and · mother respectively of said minors, who also reside in said county."

From the above it will be noted that the jurisdictional fact of residence appears in the order itself, and, as the findings set out in this order cannot be impeached collaterally, nothing is lacking to show complete jurisdiction.

Plaintiffs next contend that the contract between Brewer, as guardian, and plaintiffs for the lease of the land in controversy, was not a complete contract, for the reason that the guardian had no power to make the contract, and that such power was lodged in the Secretary of the Interior, and that before the lease in question was approved by the Secretary of the Interior, and while the same was in the hands of the superintendent of the Union agency, at Muskogee, Okla., plaintiffs withdrew their offer to accept said lease and requested the return of the check, which terminated the transaction. On this proposition the defendants contend that the secretary does not possess any contractual powers, and that the actual contract w entered into between the said guardian and plaintiffs, and that plaintiffs could not arbitrarily withdraw from it pending action upon the same by the secretary.

The Act of Congress of May 27, 1908 (35 Stat. L. 312, c. 199), providing the leasing of restricted Indian lands for oil, so far as applicable here, reads as follows:

"Provided, that leases of restricted lands for oil, gas or other mining purposes, leases of restricted homesteads for more than one year, and leases of restricted lands for periods of more than five years, may be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise: And provided further, that the jurisdiction of the probate courts of the state of Oklahoma over lands of minors and incompetents shall be subject to the foregoing provisions."

The question presented is: Where does the real authority to make the lease for the restricted Indian lie? In the case of Almeda Oil Co. v. Kelley, 35 Okla. 525, 130 Pac. 931, the facts were as follows: One Lynch, a restricted Indian, on the 13th of June, 1904, executed an oil lease to one Kelley, subject to the approval of the Secretary of the Interior. On the 23rd day of January, 1906, his restrictions were removed, and on February 19, 1907, he conveyed the land by warranty deed to the Almeda Oil Company. On February 19, 1906, Lynch protested in writing to the Secretary of the Interior against its approval. After the sale of the land, he continued his efforts to induce the secretary not to approve the lease to Kelley; but the secretary, disregarding his protest, on August 26, 1907, finally approved the Kelley lease. The question presented in the case is: Had the Secretary of the Interior the authority to approve the lease in face of the protest of the lessor? The court there held:

"That the Secretary of the Interior did not exceed his authority, under the circumstances, in giving to the lease his sanction and approval."

In the case of Jennings v. Wood et al., 192 Fed. 507, 112 C. C. A. 657, in discussing the powers of the Secretary of the Interior in approving leases, it was said:

"The jurisdiction of the Secretary of the Interior is only that expressed in the acts of Congress. He was not constituted the general guardian of the estates of the Indians in the sense in which that term is usually employed. Power was not conferred upon him to originate and make leases of allotted lands. That was left to the Indians subject to his approval in specified cases. If an Indian did not desire to lease, there was nothing for the secretary to act upon; if he did, and the lease was for oil and gas, its validity depended on the approval of that official, but he was not one of the contracting parties. On the contrary, his connection with the transaction and his authority first arose after the minds of the contractors came together, and they must have been competent to make the contract submitted for approval. A disapproval was merely a veto. An approval which proceeds upon a consideration of the terms of the instrument offered, and whether they are reasonably for the interests of the Indian was intended as an additional safeguard for his protection."

The two cases quoted from above are the only ones we have been able to find that are in point, and we can well agree with the judge, who rendered the opinion in the first case quoted from, that "there is a paucity of authority upon the direct question involved."  -

In all contracts both parties are bound, or neither are. There must always be a mutuality in the contract, and it must be binding

upon both parties, and it does not become binding until a proposition is made upon one side and accepted upon the other. In the case of the Almeda Oil Co. v. Kelley, supra, we have the reverse of the case at bar. There the lessor endeavored to withdraw from the contract before the secretary had approved the same. Here, the lessees are in the same attitude. If the court there correctly decided that the lessor, after having executed the lease to Kelley, could not withdraw from the lease entered into with Kelley pending the action of the Secretary of the Interior, then neither can plaintiffs in the case at bar escape the terms of the lease made with the guardian of Albert Carney. The facts in the Almeda Oil Co. Case present a stronger case than the one at bar, on account of the fact that the restrictions of the lessor had been removed subsequent to his signing the lease, but before the secretary approved the same. In the case of Jennings v. Wood, supra, it is contended, and perhaps correctly so, that that part of the opinion quoted above as in point in the case at bar was dictum. While it may be dictum, yet we are of the opinion that it is sound law, and sustains defendants' contention here.

If plaintiffs' contention was tenable, that the actual contract can be made by the secretary only, then it would not be material whether the acts of Brewer as guardian were valid or his appointment legal. The Secretary of the Interior in the case at bar had no right to make a contract for the lease of the land in controversy. That right rests solely in the guardian. The only actual authority of the secretary is to either approve the lease contract, or to withhold his approval. If, in refusing to approve the contract, he should further state the terms and conditions upon which he would be willing to approve a lease, it would still rest primarily with the two contracting parties, the guardian and the lessor, whether or not they elected to make a contract embracing the suggested terms, and either the guardian or the lessees would have the right to refuse to do so. Even though the terms upon which the secretary informs the parties that he would approve the lease be agreed to by the guardian and lessees, yet it still remains for the guardian to make the actual contract and execute the lease contract. It must thus be clear, in its final analysis, that the Secretary of the Interior has no real actual contractual powers. He can advise and suggest and either give or withhold his approval, but he cannot make the contract.

The plaintiffs agreed to the contract with the full knowledge that, in order for the lease to become effective, it must receive the approval of the Secretary of the Interior, and the contract was entered into upon both sides, depending upon that contingency.

The facts in this case show how unfair and inequitable it would be for the law to be such that it would permit plaintiffs to withdraw their bid at their pleasure at any time pending the action of the secretary upon the lease contract. The lease was sold to the highest bidder. At that time, it was sought by several parties and the bidding was spirited, and the records show that parties on the same day, after it was sold to plaintiffs, offered to give a considerable sum more for the lease than it was contracted for to plaintiffs. After the bids of all the competitors had been rejected and plaintiffs' accepted, it would manifestly be unfair and unjust to permit plaintiffs to now withdraw their bid and refuse to take the lease according to the terms of the contract.

Counsel argues that such a rule, which holds them bound by the terms of a lease contract which the Secretary of the Interior can arbitrarily reject at some future date, leaves them at the mercy of the secretary, and that, if for any reason there should be a rise in the value of the lease pending the action by the secretary, he would have the right to withhold his approval, and doubtless would do so, while if the value of the lease should decline then his approval would be forthcoming. As an abstract proposition, this is doubtless correct; but it must be presumed that the Secretary of the Interior would act fairly and honorably in the matter and be governed in his action by the market value of the lease at the very time the lease contract was executed by the guardian, and a rise in value of itself subsequent to that time would not influence him in the least to arbitrarily withhold his approval.. It should not be presumed in advance that the Secretary of the Interior would act in an unfair manner.

While the actual contract in the case at bar was made by the plaintiffs and Brewer, guardian, yet it was entered into subject to the approval of the Interior Department, and, if the secretary saw fit to reject it, then the contract would no longer have any binding force upon either of the contracting parties. The contract between plaintiffs and Brewer, guardian, was that, as a bonus for the oil lease, plaintiffs were to pay $18,150. Brewer had accepted this payment in a certified draft, payable upon conditions that the Secretary of the Interior approved the oil and gas lease for which the same was given with-

in sixty days from the date of the lease. Such conditions were embraced within the terms of the contract agreed on between the two contracting parties.

When the lease contract, with the certified draft with the above-noted conditions attached to it, reached the hands of the Indian superintendent at Muskogee, he at once wrote plaintiffs, among other things, as follows:

"As to the matter of bonus, it is the practice to require the lessee to pay into this office any bonus consideration which by agreement is to be paid the lessor as a consideration for the execution of the lease, which bonus consideration will be disbursed to the lessor only in the event the lease is approved by the department.

"In conformity with the practice, you will be required to pay into this office the amount of bonus agreed upon before your lease can receive favorable consideration.

"I wish you to inform me by return mail if you intend to prescribe a time limit within which your lease must be approved by the department if your offer is to hold good, and if it is your intention to pay into this office at once the bonus consideration agreed upon, so that I may determine the action to be taken in the premises."

In reply to this letter, plaintiffs at once wrote said Indian superintendent, among other things, that they desired:

"That the application for the approval of the lease be disallowed, and the check to R. P. Brewer, guardian, for $18,150.00, bonus on the lease, which was put in escrow, be returned to them."

We have been unable to place any other contruction upon the above letter from the Indian superintendent to plaintiffs, except that it was a notice to them that the lease contract between Brewer, guardian, and plaintiffs, was rejected on account of the fact that Brewer, guardian, had accepted a check in lieu of cash for the bonus, and which was payable only upon certain conditions, when the rules of the department required that all payments be made in cash and a counter proposition that the lease would be recommended for approval if plaintiffs would agree to a change in the contract and pay the actual money into the office, which plaintiffs declined to do and forthwith accepted the invitation to withdraw their bid and demanded a return of the check. The letter of the superintendent to plaintiffs was explicit to the effect that, if they intended to stand upon the conditions upon which the check was made payable, then the lease would not receive favorable consideration at their hands. Having been informed that the lease contract would be rejected unless they agreed to different terms from those entered into with Brewer, guardian, they certainly had a right at that time, if they so desired, to refuse to make such additional agreement and withdraw their bid. The letter of the Indian superintendent was in effect notice of the refusal to approve the lease contract and a rejection of the same under its then terms. It was a statement from the Indian superintendent that unless the terms of the contract with Brewer, guardian, be altered and the actual money paid over, as required by the rules and regulations of the Department of the Interior, the lease contract would not be approved, which was in effect a rejection of the lease contract as it then stood. It was a proposition to plaintiffs to either withdraw their bid or change its terms, and it came from the Indian superintendent, the agent and representative of the Department of the Interior in dealing with Indian affairs. The plaintiffs refused to agree to a change in the terms of the contract and accepted the other alternative and withdrew their bid, which they had a right to do under those circumstances. They could not withdraw from the contract made with Brewer, guardian, if the department had seen fit to approve the entire contract as made, embracing all of its terms and conditions; but, when notified that such a contract would not be approved, they had a right to terminate the same at that very moment without further negotiations, and this is the course they adopted.

It might be argued that the lease contract as actally made with Brewer, guardian, was afterwards approved; but in answer to that it can be said that, after plaintiffs had already acted and withdrawn their bid, it came too late, and it was impossible to then inject life into a dead contract.

It being evident that a new trial could not result differently, we recommend that the judgment be reversed and remanded, with instructions to the trial court to enter judgment for plaintiffs as prayed for.

On Rehearing.

John Devereux, Dillard & Blake, and C. G. Hornor, for plaintiffs in error.

Hill & Hill, Latham & Tucker, D. H. Linebaugh, and W. P. McGinnis, for defendants in error.

BRETT, J. The above opinion we think, correctly states the law, except as to the last proposition discussed. But on that question we think the opinion is wrong.

The contract in question was made by and between Crosbie & Wrightsman and R. P.

Brewer, the guardian, under proper probate procedure, subject only to one condition, and that was that the contract be approved by the Secretary of the Interior within 60 days. It was not the province of the superinendent of the Indian Agency, under the law or the terms of the contract, to approve or disapprove the contract. But by the provision of the act of Congress of May 27, 1908 (35 U. S. Statutes at Large, p. 312) the Secretary of the Interior alone had authority to approve or disapprove the contract. And the only condition imposed by the terms of the contract before it became effective was that it should be approved by the Secretary of the Interior within 60 days. And this was done.

Contracts are made by the joint will of two parties, and can only be rescinded by the joint will of the two parties. One party can no more rescind a contract without the assent of the other than he alone can make it without the assent of the other. And where the parties to a contract have provided the terms upon which their contract may be abrogated, neither can dispense with them without the consent of the other. And in the case at bar the contracting parties provided that the only condition upon which the contract in question should be abrogated was the refusal of the Secretary of the Interior to approve the contract within 60 days, Hence we think under the showing made that the trial court did not err in refusing to grant the temporary injunction prayed for. Almeda Oil Co. v. Kelley, 35 Okla. 525, 130 Pac. 931.

The judgment is therefore affirmed, and the cause remanded for such further proceedings as may be proper.

All the Justices concur except KANE, J., who dissents.

Dissenting opinion, upon application for leave to file second petition for rehearing, by

KANE, J. Inasmuch as it is clear to me that the conclusion reached by Mr. Commissioner Mathews, in the opinion prepared by him, is correct, I believe the approval thereof by the court ought not to be disturbed at this late date upon defendants' application for leave to file a second petition for rehearing.

The action of the majority of the court to the contrary, it seems to me, is predicated upon the fundamentally erroneous assumption that the lease itself, without the approval thereof by the Secretary of the Interior, constituted a completed enforeable contract between Messrs. Crosbie & Wrightsman, as lessees, and Brewer, guardian, as lessor. In my judgment, the transaction between these parties, in so far as it had proceeded up to the date of the withdrawal therefrom by Crosbie & Wrightsman, amounted to no more than an offer on the part of Crosbie & Wrightsman to lease the restricted land of an Indian minor for oil and gas purposes, provided the offer was accepted by the Secretary of the Interior by his approval of the proposed lease, pursuant to section 2 of the act of Congress of May 27, 1908, within 60 days from the date thereof. And, on the other hand, the authority of the guardian to enter into a valid lease for his Indian ward being limited by the same act of Congress, the extent of his authority was to receive such bids or offers as were made for the lease and submit them to the Secretary of the Interior for acceptance or approval. As there is no contention that this offer to enter into a lease was supported by any consideration whatever, it follows that the proponents were at liberty to withdraw therefrom at any time before its acceptance by the Secretary of the Interior, who had full power to reject the offer or accept the same.

Mr. Elliott, in his valuable work on Contracts (1 Elliott on Contracts, § 33) states the applicable rule as follows: An offer unsupported by any consideration may be withdrawn at any time before acceptance. From the few examined of the many cases supporting the text collected by the learned author in a note, I select Northeastern Construction Co. v. Town of N. Hempstead, 121 App. Div. 187, 105 N. Y. Supp. 581, as an authority closely in point by analogy upon the question herein involved. In that case the plaintiffs bid on a bridge contract which was to be let by defendant's board of highway commissioners. In acting on this bid a resolution was passed that the plaintiffs be notified that their bid be accepted conditioned upon leave being granted by the board of supervisors to issue bonds of the town in the sum of $20,000. Before anything else was done plaintiffs wired that they withdrew their bid and sent a letter of explanation. In an agreed case, which involved the right of the plaintiffs to recover back their certified check deposited with their bid, it was held that there was no acceptance of the plaintiff's bid which would bind them, and they were entitled to a return of the deposit made when the bid was submitted.

In the case at bar, the plaintiffs made a bid for a lease on the restricted lands of an Indian minor, and the guardian received the bid and a certified check representing the cash bonus for the lease, for the purpose of having the lease accepted or approved by the

Secretary of the Interior. Before anything else was done, the plaintiffs withdrew their offer. There being no consideration to support the offer to lease, the authorities certainly sustain the right of the proposed lessees to withdraw the same any time before its acceptance by the Secretary of the Interior; the rule being that until a proposal be accepted it may be withdrawn. M. H. & C. Co. v. Rochester, 178 U. S. 373, 20 Sup. Ct. 957, 44 L. Ed. 1108. In the case at bar, it is true that notwithstanding the withdrawal of the offer to lease by the proposed lessees the Secretary of the Interior afterward approved the proposed lease within the time specified in the offer. But this was unavailing, for "after an offer has been legally withdrawn, there can be no acceptance such as will make a binding contract." 1 Elliot on Contracts, § 34. And from what has been said it does not follow that it is possible for a proponent to withdraw at will every offer he may make, "for if the offer is given for a certain definite time and is supported by a valuable consideration, it cannot be revoked or withdrawn during the time specified." 1 Elliott on Contracts, § 33.

For the reasons stated, I am of the opinion that the application for leave to file second petition for rehearing should be denied.