# MOFFETT, HODGKINS AND CLARKE COMPANY *v.* ROCHESTER.

CERTIORARI TO THE COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 217. Argued April 10, 11, 1900.—Decided May 21, 1900.

The city of Rochester invited proposals from contractors for two separate contracts for work to be done for the improvement of its water works. Among others who bid were the petitioners, the Moffett, etc. Company, who put in bids for each. Owing to causes which are set forth in full in the opinion of the court, some serious mistakes were made in the figures in their proposals, whereby the compensation that they would receive if their bids were accepted and the work performed by them would be diminished many thousand dollars. When the bids were opened by the city government their bids were the first opened, and as they were read aloud their engineer noticed the errors and called attention to them and stated what the figures were intended to be and should be. The statutes of New York provided that "neither the principal nor sureties on any bid or bond shall have the right to withdraw or cancel the same until the board shall have let the contract for which such bid is made and the same shall have been duly executed." The city government rejected one of their bids and accepted the other, and called for its performance at the prices stated in the bid. The company declined to enter into a contract for the performance of the work at that price; and, claiming that the city threatened to enforce the bond given with the proposals, brought suit praying for a reformation of the proposals to conform to the asserted intention in making them and their execution as reformed, or their rescission; and for an injunction against the officers of the city, restraining them from declaring the complainant in default, and from forfeiting or enforcing its bond. Judgment was rendered in the Circuit Court in the company's favor, which was reversed in the Circuit Court of Appeals. The case was then brought here on certiorari. *Held:*

(1) That there was no doubt of the mistake on the part of the company;

(2) That there was a prompt declaration of it as soon as it was discovered;

(3) That when this was done the transaction had not reached the degree of a contract.

The party alleging a mistake must show exactly in what it consists and the correction that should be made. The evidence must be such as to leave no reasonable doubt on the mind of the court as to either of these points. The mistake must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended. A mistake on one side may be a ground for rescinding, but not for reforming a contract. Where the minds of the parties have not met there is no contract, and hence none to be rectified. *Hearne* v. *Marine Ins. Co.,* 20 Wall. 488, cited on these points and approved.

THIS suit grows out of alleged errors in the proposals of the complainant for the execution of certain improvements conducted by the city of Rochester, New York.

The proposals of the complainant were accepted, but it declined to enter into a contract in accordance therewith, on the grounds hereafter stated, and the city, it is claimed, threatened to enforce the bond given with the proposals.

The bill prays for a reformation of the proposals to conform to the asserted intention in making them and their execution as reformed, or their rescission. Also an injunction against the officers of the city declaring complainant in default, its bond forfeited or enforced.

The substance of the bill is that the city of Rochester, through its proper executive board, determined to make improvements and extensions in the city's water works, and, among other things, to construct a masonry conduit for a distance of 12,000 feet from Hemlock Lake northward, and proposed to enter into a contract therefor. The contract was known as contract No. 1.

Also, to construct a riveted steel pipe conduit thirty-eight inches or forty inches in diameter, commencing at the north end of the masonry conduit, and terminating at Mount Hope reservoir, in the city; length, about 140,000 feet. The contract was known as contract No. 2.

Voluminous specifications were prepared by the city, in printed form, aggregating about three hundred printed pages,

elaborately specifying, with infinite detail, the requirements of the executive board, the method in which the work was to be performed, the character of the materials required to be furnished, and the tests to which the materials were to be subjected. A copy of the schedule, with other schedules, was attached to the bill.

On December 10, 1892, public notice was given to contractors that proposals would be received for such work until 12 o'clock noon of December 23, 1893, at which time the bids were to be publicly opened by the chairman of the executive board.

The complainant was a contractor having an office in New York, and employed engineers to prepare proposals of the character contemplated by the city of Rochester, and complainant's officers were engaged in important and distracting occupations, and connected with other business which required them to delegate the duties ordinarily performed by them in connection with the work, such as described, to their subordinates. The agents of complainants, though they exercised due diligence, were unable to procure the forms of the proposals for such contracts until on or about the 15th of December, 1892, and its engineer proceeded to Rochester on the 20th of December, 1892, having attempted in the meantime to familiarize himself with the terms of such contracts, and there conferred with the engineers of the city, visited the line of the proposed conduit, and proceeded with the preparation of the proposals of the contracts Nos. 1 and 2.

The labor devolving upon him in the period of time allowed him for preparing the proposals made him nervous and confused, and in transcribing the figures prepared by him he accidentally made certain clerical errors.

Contract No. 2 submitted for consideration two routes, over 8000 feet of the 140,000 of the proposed steel conduit. They were respectively designated in the proposals and specifications route "A" and route "B," and the city reserved the right of electing either of them, and further electing to require a thirty-eight inch pipe or a forty inch pipe to be furnished by contractors.

Route "A" was located in alluvial flats through which the

creek meanders, and involved several crossings of its existing and former channels. Route " B " was located wholly west of the creek, and required the construction of a tunnel with the necessary shafts, inlet and overflow chambers, manholes and their appurtenances.

The specifications of route " A " involved sixty-one different items and quantities of work and materials, route " B " seventy-five. Among the items of route " B " was that known as "d," and described in the specifications as follows :

" For all earth excavations in open trenches or pits, for the masonry and pipe conduit, entrance and overflow chambers, gate vaults, blow offs, pipe overflows, bridges, railroad crossings, creek crossings and culverts carried under said conduit, including bracing and sheeting, back filling of trenches and masonry, making embankments and other final disposal of the excavated material with haul of 1000 feet or less, bailing and draining and all incidental work."

That item in route " A " was in precisely the same language, and the quantity of excavation contemplated by said items was 184,000 cubic feet of earth, and referred to precisely the same work. The complainant and its engineer intended to bid for said work the sum of 70 cents per cubic yard, and which sum was a fair and reasonable price for the work, and such sum was inserted in the proposal for route " A," but by accident and mistake 50 cents was inserted in the proposal for route " B," and the price intended to be proposed therefor was some $36,800. The sum of 50 cents per cubic yard was a wholly insufficient price for such work. The proposal in route " B " also contained an item in the following language, to wit : " ' h.' For all earth excavation in tunnel, including all necessary bracing, timbering, lighting, ventilating, removal and back filling and other final disposal of the excavated material with haul of 1000 feet or less, pumping, bailing and draining and all incidental work."

The defendants' engineer estimated the quantity of excavation under this item at 2000 cubic yards, and it was intended to charge for such work $15 per cubic yard, which was a fair and reasonable charge. In haste and confusion the engineer,

who is extremely near sighted, in transcribing his figures, by accident and mistake inserted the sum of $1.50 per cubic yard, which was grossly inadequate and far below what would be the actual cost of the work under the most favorable circumstances. The difference between the bid as inserted and that which was intended to be inserted was the sum of $27,000.

A bond was required with proposals in the penal sum of $90,000, conditioned upon the performance of the work if the bid should be accepted and the making of the contract with the city in accordance with the notice to contractors. Complainant executed the bond with Henry D. Lyman and the American Surety Company as sureties, but at the time of its execution the proposal annexed thereto was entirely in blank, and in the time which elapsed between the time the bond was taken to the city and the presentation of the proposals it was impossible to insert in the pamphlet containing the bond the proposals for the work contemplated by contracts Nos. 1 and 2, or either of them.

The prices were inserted in other and different pamphlets of the same general character, but were not signed or in any way executed by complainant or by any of its officers. The pamphlets containing the bond and the pamphlet containing the proposals were placed in a single package.

The complainant was led to believe by the defendants and their officers that although the masonry conduit and the riveted steel conduit were separately described, they constituted a continuous piece of work, and any person bidding upon both sections whose bid was lower in the aggregate than any other for the same work should be awarded the contract. With this understanding and for the purpose of making a single proposition for the entire work, complainant deposited the package containing the proposals for the work upon both sections with the executive board. The notice to contractors provided that every bid for the masonry conduit should be indorsed "Proposal for performing contract No. 1, Rochester Water Works Conduit," and that every bid for the riveted steel pipe conduit should be inclosed in a sealed envelope and indorsed "Proposal for performing of contract No. 2, Rochester Water Works Conduit."

Complainant did not comply with the provisions, but addressed its proposals in one package to the executive board. The proposals were immediately opened by the chairman of the board and declared informal, and not in compliance with the requirements of the board, but they were nevertheless read together with other proposals. That for line " B," in contract No. 2, was read by the clerk in the presence of the members of the board before any other proposals for work on said line were read, and immediately upon reading item " d," relating to earth excavation in open trenches, the engineer of complainant, who prepared the proposals, informed the board that the price of fifty cents per cubic· yard was a clerical error, and that it was the intention to charge seventy-five cents per cubic yard, the same. price charged for the identical work on line " A."

There were six bidders on contract No. 1, including complainant. Its bid was $473,790. The lowest bidder was W. H. Jones & Son, whose bid was $262,518.

The bids on contract No. 2, with items, were tabulated in a statement and annexed to the bill.

The complainant's bid on earth excavation, in open trench on route " A," was 70 cents per cubic yard. The other bids ranged from 75 cents to 85 cents.

For the same work on route " B " complainant's bid was 50 cents per cubic yard. The other bids from 75 cents to 85 cents.

The complainant's bid for earth excavations in tunnel upon route " B," contract No. 2, was $1.50 per cubic yard. The other bids were, respectively, $12.00 and $15.00.

The complainant's aggregate bid for work on route " B " was $857,552.50. The lowest was $1,130,195.00, that of Whitmore, Rauber & Co.

If complainant was allowed the amount of its error, viz., $63,800, its proposal for route " B " would be $921,354.50, which sum was $208,842.50 less than the next lowest bid, which was that of Whitmore, Rauber & Vicinus.

The aggregate bids of complainant as corrected were $1,395,142.50, which were considerably less than the aggregate of any other contractor. For thirty-eight inch pipe on line " B "

its aggregate bid was $1,331,342.50, which was largely below that of any other contractor.

In order to take an improper and unconscionable advantage of complainant and the clerical errors made by it, the executive board on the 10th of January, 1893, notified complainant that the defendants intended to enter into a contract for the work of contract No. 1 with W. H. Jones & Son, although complainant's proposals for the work on both contracts were the lowest in the aggregate for the entire work contemplated. Thereupon on the 11th of January, 1893, before any official action with respect to letting the contracts was taken, complainant protested against the division of the proposals and letting the work of contract No. 1 and No. 2 separately, and insisted that the defendants were bound to enter into a contract with it for the entire work described in both contracts, or none at all, and informed the defendants of the clerical errors for the work on line " B," and requested to correct them. And further demanded the contract for both sections at the corrected prices, or that it be permitted to withdraw its proposals.

On the 12th of January, 1893, the executive board, acting in bad faith and to take an unfair and unconscionable advantage of the clerical errors which had been committed, the commission of which the defendants conceded, adopted the resolution annexed to the bill and marked schedule " B," and caused copies to be served on the complainant.

The defendant proposed, in conformity with the resolutions, to insist upon the execution of the contract for laying a thirty-eight inch pipe on route " B " for the prices inserted in complainant's proposal, and intended, if complainant refused, to declare it in default, the bond executed by it forfeited, and to proceed to enforce the bond.

The said threatened action was contrary to good conscience, the contents of the proposals and the rights of complainant, and unless restrained, would cause it irreparable injury, for which there was no adequate remedy at law. The matter in dispute, exclusive of interest and cost, exceeded the sum or value of $2,000.

The following are the resolutions marked schedule " B ":

" OFFICE OF THE EXECUTIVE BOARD,

" ROCHESTER, N. Y., *January* 12, 1893.

" By Mr. Schroth :

" Resolved, That the proposal of the Moffett, Hodgkins & Clarke Company, of New York, N. Y., submitted on December 23, 1892, for the construction of a riveted steel pipe conduit 38 inches in diameter, and all the required appurtenances thereto, commencing at the north end of the contemplated masonry conduit near the village of Hemlock Lake, Livingston County, N. Y., and terminating at Mt. Hope reservoir, in the city of Rochester, N. Y., and by route ' B ' as described in the notice of letting for said work, be, and the same is hereby, accepted, and that said work be and hereby is awarded to said Moffett, Hodgkins & Clarke Company.

" By Mr. Schroth :

·' Resolved, That the Moffett, Hodgkins & Clarke Company, of New York, be and they are herewith required to attend at the office of this board, along with the sureties to be offered by said company, on or before Thursday, January 19, 1893, and to execute at that time the contract for the performance of the work of constructing a riveted steel pipe conduit 38 inches in diameter, and all the required appurtenances thereto, by route ' B,' from the north end of the contemplated masonry conduit near the village of Hemlock Lake, Livingston County, N. Y., to Mt. Hope reservoir in the city of Rochester, N. Y., and that the failure of such attendance and execution will be regarded as an abandonment of intention on the part of said Moffett, Hodgkins & Clarke Company to perform said work.

" By Mr. Schroth :

" Resolved, That the clerk be, and he is hereby, directed to cause immediate legal service of notice of award of contract to be made on the Moffett, Hodgkins & Clarke Company, of New York, N. Y., in accordance with the foregoing resolutions."

The answer admitted the allegations of the bill in regard to the powers of the executive board, and that it determined to enter into a contract set forth in the bill ; that it prepared spec-

ifications and gave notice as stated, and required bond to accompany proposals conditioned as alleged; that the complainant had such bond executed and annexed the same to its proposal of contract No. 2.

The answer alleged that the defendants did not know and could not set forth their belief or otherwise whether complainant was a corporation or employed engineers, or what their duties were, or that the officers of the complainant had to delegate important duties to subordinates, or whether its agents could procure firms to contract and make proposals before the 15th of December, 1892; or whether its engineer was nervous or made mistakes as alleged or in the way alleged, or the prices bid were inadequate, or that complainant was led to believe by the defendants that contracts Nos. 1 and 2 would be let jointly and not separately, or. its bid declared informal and cannot be received, or that its engineer when the bids were opened notified the board that the prices which had been read for item "d" of route "B" in contract No. 2 of fifty cents per cubic yard was a clerical error.

The answer then proceeded in substance as follows:

The notice for bids required that all bids should state the prices for every separate item of work named in the proposals, should be plainly stated and distinctly written in ink, both in words and figures, in the proposed blanks left therefor; that the complainant's engineer received all communications requested by him from the executive board and its engineer, and all the plans and specifications and information were at the complainant's command before its submission of the proposals for the contract.

On account of the treacherous subsoil disclosed by borings along route "B" in contract No. 2, the latter route would be the least expensive, and the prices complained of by complainant were reasonable and fair values for the work set forth, and it was denied that clerical errors were contained in the proposals, or that they were less than the average bids by competitive bidders, and averred that the amounts were knowingly and intentionally inserted to make complainant's bid what is known as an "unbalanced bid," to wit, in which the contractor will

give a "low price for one kind of work or materials in the same contract with the hope that the quantity of work and materials for which a low price is bid will be reduced, while the quality of materials or work for which a high price is bid will be increased, thus making up on the high price bid sufficient to give the contractor a large profit upon the whole work."

The complainant bid upon some items in contract No. 2 in excess of a reasonable price, thus making its bid for route " B," contract No. 2, an unbalanced bid, enabling complainant to realize upon the completion of the work far in excess of the amount based upon the estimates of defendant's engineer.

In pursuance of the notice to contractors the board awarded to W. H. Jones & Sons contract No. 1, they being the lowest bidders, and to complainant contract No. 2, it being the lowest bidder, but this was not done to take undue and unconscionable advantage of the manner in which the proposals were made under contracts Nos. 1 and 2, and presented to the board, nor did the board act in bad faith and award the contract for the purpose of taking advantage of the alleged clerical errors.

On the 12th of December, 1892, by the resolution marked schedule " B," the board duly and legally awarded to the complainant the contract for the construction of the conduit of route " B " in contract No. 2, and the complainant was notified to attend at the office of the board with its sureties to execute the proposed contract, and the complainant " without sufficient reason or excuse, and with intent to defraud said defendants, did refuse and neglect to enter into said contract, and said defendants deny that said complainant is entitled to the relief, or any part thereof, in the said complaint demanded, and they respectfully submit that the injunction awarded against them by this honorable court on the 15th day of February, 1893, ought to be dissolved, and that the said bill ought to be dismissed, with costs."

Evidence was submitted on the issues, including the specifications, proposals and bond.

A decree was entered adjudging the proposals of the complainant for the conduit on line or route " B " to be "rescinded, canceled and declared null, void and of no effect," and ordering

an injunction to be issued restraining the city and its officers from declaring complainant in default with respect to its bids and proposals, " or from declaring forfeited the bond executed by and on behalf of said complainant, and accompanying the aforesaid bids and proposals, or from in any manner suing upon or attempting to enforce or collect the said bond."

Commenting on the facts the learned trial judge said:

" The question in this controversy is plain and simple: Shall the complainant be held to an erroneous bid by which it agreed to do certain work for the city of Rochester for $63,800 less than was intended? The work related to the construction of a conduit to convey the water of Hemlock Lake to the city. By a mistake of Mr. Burlingame, its engineer, the complainant bid fifty cents per cubic yard for earth excavation in open trenches when it intended to bid seventy cents, and one dollar and fifty cents for earth excavation in tunnel when it intended to bid fifteen dollars.

" The proof of these mistakes is clear, explicit and undisputed. As soon as the item proposing to do the work for fifty cents, as aforesaid, was read at the meeting of the executive board, and before any action was taken thereon, Mr. Burlingame stated that it was an error, and that complainant intended to bid for route B the same as for route A, viz., seventy cents.

" There is some testimony of a negative character that this prompt repudiation of the bid did not take place, but the great weight of testimony is in favor of the complainant. Had the errors been corrected the complainant's bid would still have been $200,000 below the next lowest bid. On route A the complainant's bid was $903,324. The mistakes all occurred on route B, and yet route A was selected, and the work awarded to other bidders for $1,123,920, or $220,596 more than the complainant's proposal.

" Upon the principal issue there is no disputed question of fact. Counsel for the defendants, though not admitting the mistakes, which are the basis of the action, do not dispute them. The oral argument proceeded upon the theory that the mistakes were made precisely as alleged.

" In order that no injustice may be done to the defendants,

their position in this regard is stated in the language of their brief, as follows:

" ' We admit that the evidence of the complainant shows that Mr. Burlingame entered in his proposal sheets certain figures and numbers different from those which he intended to make, and that the defendants have no evidence to contradict his testimony.' " 82 Fed. Rep. 255.

On appeal to the Circuit Court of Appeals the decree was reversed, with instructions to the Circuit Court to dismiss the bill. 33 C. C. A. 319. The case is here on writ of certiorari.

Other facts are stated in the opinion.

*Mr. Louis Marshall* for petitioner.

*Mr. Porter M. French* for respondents.

MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

Both of the lower courts agree that there was a mistake. The Circuit Court said that the proof of it was " clear, explicit and undisputed." The Circuit Court of Appeals, while expressing no dissent as to the fact, said " that one of the alleged mistakes, that in respect to the tunnel excavation, was not a mistake in any legal sense, but was a negligent omission arising from an inadequate calculation of the cost of the work."

We do not think the negligence was sufficient to preclude a claim for relief if the mistakes justified it.

This court said in *Hearne* v. *Marine Insurance Company*, 20 Wall. 488, 490, by Mr. Justice Swayne:

" The reformation of written contracts for fraud or mistake is an ordinary head of equity jurisdiction. The rules which govern the exercise of this power are founded in good sense and are well settled. Where the agreement as reduced to writing omits or contains terms or stipulations contrary to the common intention of the parties, the instrument will be corrected so as to make it conform to their real intent. The parties will be placed as they would have stood if the mistake had not occurred.

"The party alleging the mistake must show exactly in what it consists and the correction that should be made. The evidence must be such as to leave no reasonable doubt upon the mind of the court as to either of these points. The mistake must be mutual, and common to both parties to the instrument. It must appear that both have done what neither intended. A mistake on one side may be a ground for rescinding, but not for reforming, a contract. Where the minds of the parties have not met there is no contract, and hence none to be rectified."

The last two propositions may be claimed to be pertinent to the case at bar, even though the transactions between the parties be considered as a completed contract.

There was no doubt of the mistake, and there was a prompt declaration of it as soon as it was discovered and before the city had done anything to alter its condition. Indeed, according to the testimony of one witness, the clerk of the board before the mistake was declared by complainant's engineer expressed the thought that fifty cents per cubic yard for earth excavation was too low, "and there was some discussion about it at the time, but Mr. Aldridge (he was chairman of the board) said he (the clerk) might as well go on and read it, as the bid was informal." The reading proceeded, and subsequently the board let the work on contract No. 1 to Jones & Son, and accepted complainant's proposals containing the mistakes for the work on line "B," contract No. 2, although complainant protested that there was a mistake in the price of earth excavation and also in tunnel excavation. This was inequitable, even though it was impelled by what was supposed to be the commands of the charter. It offered or forced complainant the alternative of taking the contract at an unremunerative price, or the payment of $90,000 as liquidated damages. We do not think such course was the command of the statute or the board's duty.

The rule between individuals is that until a proposal be accepted it may be withdrawn, and if this principle cannot be applied in the pending case, on account of the charter of the city, there is

certainly nothing in the charter which forbids or excuses the existence of the necessary elements of a contract.

The charter of the city provides that "neither the principal nor sureties on any bid or bond shall have the right to withdraw or cancel the same until the board shall have let the contract for which such bid is made, and the same shall be duly executed." A perfectly proper provision, but as was said by the learned Circuit Court:

"The complainant is not endeavoring 'to withdraw or cancel a bid or bond. The bill proceeds upon the theory that the bid upon which the defendants acted was not the complainant's bid; that the complainant was no more responsible for it than if it had been the result of agraphia or the mistake of a copyist or printer. In other words, that the proposal read at the meeting of the board was one which the complainant never intended to make, and that the minds of the parties never met upon a contract based thereon. If the defendants are correct in their contention there is absolutely no redress for a bidder for public work, no matter how aggravated or palpable his blunder. The moment his proposal is opened by the executive board he is held as in a grasp of steel. There is no remedy, no escape. If, through an error of his clerk, he has agreed to do work worth a million dollars for ten dollars, he must be held to the strict letter of his contract, while equity stands by with folded hands and sees him driven to bankruptcy. The defendant's position admits of no compromise, no exception, no middle ground."

These remarks are so apposite and just it is difficult to add to them. The transactions had not reached the degree of a contract — a proposal and acceptance. Nor was the bid withdrawn or cancelled against the provision of the charter. A clerical error was discoverd in it and declared, and no question of the error was then made or of the good faith of complainant.

It is true it is now urged by counsel that there was no mistake, but that the prices were deliberately and consciously inserted for the purpose of making an "unbalanced bid," in which low prices in some items are compensated by high prices in others. The Circuit Court and the Circuit Court of Appeals

found against this view, and this court usually accepts such concurrence as conclusive.

The Circuit Court of Appeals, however, found that while there was a clerical error for the earth excavation in contract No. 2, route "B," that the alleged mistake in tunnel excavation "was not a mistake in any legal sense, but was a negligent omission arising from an inadequate calculation of the cost of the work." Further, the court said:

"It is also manifest that the complainant did not intend to give the board an opportunity to correct the mistakes and award the contract on the corrected basis. There was no color of foundation for the assertion that the proposals were to be treated as a single bid for contracts No. 1 and No. 2, and that both contracts must be awarded to the complainant or neither. The position thus taken by the complainant was well calculated to excite distrust on the part of the board and induce its members to believe that the alleged mistakes were an afterthought, conceived when the complainant had become convinced by studying the proposals of its competitors that it could not profitably carry out the contract on the terms proposed."

We are unable to concur in either of these conclusions. The mistake in tunnel excavations arose from inadvertently making the cost of one item — mere earth digging and putting the dirt into cars — the total cost without making "any allowance for any work preparatory to it or connected with it," to quote the testimony of complainant's engineer. And it seems impossible for the error to have escaped the notice of the board. Other contractors charged for the same work $12 and $15.

The conclusion that the complainant did not intend to give the board an opportunity to correct the mistakes is based on a letter addressed to the board, in which it claimed unity in the contracts and bids, and demanding that "the contract in its entirety for both sections of the work be awarded to us at the corrected price, or that we may be allowed to withdraw our proposal and have our bid returned to us."

But before the time expressed in the resolutions of the executive board of the city for the complainant to appear and execute a contract, or it would be regarded as abandoning its intention

to do so, complainant filed its bill in this case, and appealed to a court of equity to determine its rights and obligations.

On filing the bill and supporting affidavits, on the 18th of January, 1893, an order was issued temporarily restraining the officers of the city from declaring the complainant in default or from forfeiting or suing on its bond, until a motion for an injunction *pendente lite* could be heard. Subsequently, after hearing and argument, an injunction *pendente lite* was issued.

Prior to its issuing, but after the restraining order, the executive board accepted the bid of Whitmore, Rauber & Vicinus, and entered into a contract with them for the construction for the riveted steel pipe conduit, thirty-eight inches in diameter, for route "A," for eight thousand feet. That is on a different route and claimed to be the subject of a different contract from that awarded to the complainant.

This action made a reformation of the proposals impossible—made any action of the Circuit Court impossible, except to annul the proposals or dismiss the bill and subject the complainant to a suit on its bond. If the decree was narrowed to this relief it was the fault of the city, not of the complainant. Whatever its prior claims and pretensions may have been, by submitting itself to a court of equity complainant submitted itself to abide by what that court should decree, and the alternative of a reformation of the proposals was certainly not their execution unreformed.

By letting the contract to Whitmore, Rauber & Vicinus, the city, in effect, evaded the restraining order, forestalled the action of the Circuit Court, and prevented the reformation of the proposals; and by preventing that justified the decree which was entered.

The decree of the Circuit Court of Appeals is reversed and that of the Circuit Court is

*Affirmed.*