### RUSTON DRILLING CO. v. UNITED STATES FIDELITY & GUARANTY CO.

#### No. 10353.

Circuit Court of Appeals, Eighth Circuit.

Feb. 27, 1936.

C. E. Wright, of El Dorado, Ark. (Robert C. Knox, of El Dorado, Ark., on the brief), for appellant.

H. S. Yocum, of El Dorado, Ark. (J. K. Mahony, of El Dorado, Ark., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

The United States Fidelity & Guaranty Company in 1932 issued to the Ruston Drilling Company its policy of employer's liability insurance, whereby it agreed "To settle and/or defend * * * all claims

944

resulting from the liability imposed upon the assured by law for damages on account of bodily injuries, including death at any time resulting therefrom, accidentally suffered or alleged to have been suffered by any employee or employees of the assured." By the terms of the policy, the period during which it was to be in force was from July 22, 1932, to July 22, 1933. The original limits of liability contained in an indorsement or rider attached to the policy were $25,000 for one employee and $50,000 for a single accident. The monthly premium called for by the policy was $5.154 for each $100 of pay roll. On the afternoon of September 16, 1932, the agent of the Guaranty Company at El Dorado, Ark., mailed a letter to the assured at Ruston, La., advising it that the Guaranty Company wished to reduce the limits of its liability under the policy. Two indorsements or riders were inclosed—one reducing the limits of the Guaranty Company's liability from $25,000 to $10,000 for any one employee and from $50,000 to $20,000 for any one accident; the other reducing the premium from $5.154 per $100 of pay roll to $4.548 per $100 of pay roll. Each indorsement provided, "This endorsement is effective as of September 1, 1932." The letter requested that the insured remove from the policy the indorsement limiting liability to "$25/50,000.00," and attach, in lieu, the new indorsements. The letter was received at the office of the assured on September 19, 1932. At that time the officers of the assured who were in active charge of its business were away. They returned about October 1, 1932. On October 3, 1932, F. B. James, the treasurer and general manager of the assured, after discussing the matter with T. L. James, the assured's president, detached from the policy the old indorsements providing for the higher limits and higher premium, and attached the new indorsements providing for the lower limits and lower premium. He sent the old indorsements to the Arkansas Finance Company, the agent of the Guaranty Company, at El Dorado, Ark., in a letter reading, so far as material, as follows:

"We have your letter of September 16th, enclosing endorsement on our U. S. F. & G. Policy CE-13705, reducing the limits of liability to $10,000.00 and $20,000.00.

"While we would prefer to have the higher limits shown in the policy, in view of your explanation, we are returning the endorsement showing the limits of $25,000.00 and $50,000.00 for cancellation. * * * "Send payroll report blanks.

"Very truly yours,

"Ruston Drilling Company, Inc.,

"By F. B. James."

On October 4, 1932, the agent of the Guaranty Company sent a blank for use in reporting the September pay roll in a letter to the assured, which stated: "You will note that the rate on your employer's liability is reduced, effective September 1st, on account of the reduced limits." The substituted indorsements remained attached to the policy, and the assured at no time made any objection to the substitution. From and after September 1, 1932, the monthly premium was paid at the reduced rate and based upon the limits provided for in the substituted indorsements. The premiums as reduced were paid without objection by the assured. The assured never paid or offered to pay, for the month of September, any greater premium than that provided for in the substituted indorsement.

On the morning of September 21, 1932, an employee of the assured by the name of Adair had been injured. The assured's superintendent at Smackover knew about it and took Adair to the doctor. The injury was regarded as trivial. Whether the superintendent reported the accident to the assured's officers or whether he failed to report it is not clear. In any event, the first knowledge the officers of the assured who substituted the new indorsements, claim to have had about it was on October 13, 1932, when they received a letter from the Guaranty Company stating that it had received a doctor's bill for the treatment of three employees of the assured, one of whom was Adair, and that it had received no report of an injury to any of these men. A report was requested and blanks were inclosed. It is fairly certain that up to that time the Guaranty Company was not aware of any injury to Adair. The assured mailed the report blanks to the superintendent at Smackover and directed him to report the accident to the Guaranty Company's agent at El Dorado. On January 13, 1933, Adair sued the assured in the circuit court of Ouachita county, Ark., to recover damages for personal injuries received in the course of his employment and alleged to have been caused by assured's negligence. At that time it was thought that the accident was not serious

and that the suit could be settled for $200. Mr. F. B. James, who substituted the new indorsements for the old, testified that the case did not look serious to him. The Guaranty Company defended the suit. On April 4, 1933, as the result of a trial, Adair recovered a judgment against the assured for $20,000 and costs. He offered to settle for $15,000. The Guaranty Company recommended to the assured the acceptance of the offer, and agreed to contribute $10,-000, the limit of its liability. The assured contended that the limit of the Guaranty Company's liability so far as Adair was concerned was $25,000. Finally the Guaranty Company contributed $10,000 and the assured $5,000 for a satisfaction of the Adair judgment; this without prejudice to the claim of the assured that the Guaranty Company was obligated to pay the entire $15,000.

The assured then commenced this action at law to recover from the Guaranty Company the $5,000 which the assured had paid to Adair, contending that, with respect to his claim, the reduced limits of the policy did not apply. The Guaranty Company set up the reduction of the limits of liability by virtue of the indorsements substituted October 3, 1932. The assured filed a response asserting, in effect, that, if the substituted indorsements were to be treated as reducing the limits of liability with respect to the claim of Adair, they did not express the real intention of the parties and in equity should be rescinded or reformed because of mutual mistake.

The case came on for trial. The assured introduced all of its evidence and rested. The Guaranty Company then introduced its evidence. The assured introduced some evidence in rebuttal. At the close of all the evidence, the assured moved the court to transfer the case to the equity docket for rescission or reformation of the endorsements. This motion was denied. The Guaranty Company moved for a directed verdict, which was granted. From the judgment, the assured appealed, assigning as error the denial of its motion to transfer to equity and the granting of the motion of the Guaranty Company for a directed verdict.

If, under the evidence, the assured was entitled to no relief either in law or equity, the judgment must be affirmed.

■ Judicial construction of a contract requires a determination of the meaning of the language used by the parties, and not ascertainment of some possible but unexpressed intent. Canadian National Ry. Co. v. George M. Jones Co. (C.C.A.6) 27 F. (2d) 240, 242; Hunt v. Triplex Safety Glass Co. of North America, Inc. (C.C.A. 6) 60 F.(2d) 92, 94.

■ The language of the indorsements substituted October 3, 1932, is plain and unambiguous. It expressly reduced the limits of the Guaranty Company's liability from September 1, 1932, and the premiums of the assured from the same date. That the minds of the parties met cannot seriously be questioned. Hence the contract of insurance, as it was amended October 3, 1932, and stood at the time this suit was brought, could not be made the basis of recovery by the assured in an action at law or be helped out by any doctrine of the common law. Northern Assurance Co. of London v. Grand View Building Ass'n, 203 U.S. 106, 107, 27 S.Ct. 27, 51 L.Ed. 109; Hutchings v. Caledonian Ins. Co. of Scotland (C.C.A.4) 35 F.(2d) 309, 312. This because of the common-law rule that contracts are to be enforced according to their terms, and that a contractor must stand by the words of his contract. Upton, Assignee, v. Tribilcock, 91 U.S. 45, 50, 23 L. Ed. 203; Jonesboro Compress Co. v. Mente & Co. (C.C.A.8) 72 F.(2d) 3–5; Grymes v. Sanders et al., 93 U.S. 55, 63, 23 L.Ed. 798.

■ The claim of the assured that its officers had no authority to agree to a reduction of the limits of liability of the Guaranty Company for the month of September, 1932, cannot be sustained in view of the acceptance and retention by the assured, without protest or objection, of the benefits of the contract (the reduced premiums) made in its behalf. It could not take the advantages of the agreement and repudiate its burdens. McLean v. Clapp, 141 U. S. 429, 432, 12 S.Ct. 29, 35 L.Ed. 804; Burnes et al. v. Burnes et al. (C.C.A.8) 137 F. 781, 800; Illinois Trust & Savings Bank v. City of Arkansas City (C.C.A.8) 76 F. 271, 293, 34 L.R.A. 518.

It seems clear that, if the assured is to recover, it must be upon the theory that the contract evidenced by the indorsements substituted October 3, 1932, failed to express the true intent of the parties because of a mutual mistake, and was subject to reformation.

■ "The reformation of written contracts for fraud or mistake is an ordinary head of equity jurisdiction. The rules which

govern the exercise of this power are founded in good sense and are well settled. Where the agreement as reduced to writing omits or contains terms or stipulations contrary to the common intention of the parties, the instrument will be corrected so as to make it conform to their real intent. The parties will be placed as they would have stood if the mistake had not occurred.

"The party alleging the mistake must show exactly in what it consists, and the correction that should be made. The evidence must be such as to leave no reasonable doubt upon the mind of the court as to either of these points. The mistake must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended. A mistake on one side may be a ground for rescinding, but not for reforming, a contract. Where the minds of the parties have not met there is no contract, and hence none to be rectified." Hearne v. New England Mutual Marine Ins. Co., 20 Wall. 488, 490, 22 L.Ed. 395.

See, also, Snell v. Atlantic Fire & Marine Ins. Co., 98 U.S. 85, 88, 89, 90, 25 L.Ed. 52; Griswold v. Hazard, 141 U.S. 260, 283, 284, 11 S.Ct. 972, 999, 35 L.Ed. 678; Moffett, Hodgkins & Clarke Co. v. Rochester, 178 U.S. 373, 384, 385, 20 S.Ct. 957, 44 L.Ed. 1108; Philippine Sugar Estates Development Co. v. Government of Philippine Islands, 247 U.S. 385, 387, 38 S.Ct. 513, 62 L.Ed. 1177; Lumber Underwriters of New York v. Rife, 237 U.S. 605, 610, 35 S.Ct. 717, 59 L.Ed. 1140; Donnelly v. Northwestern Life Ins. Co. (C.C.A.5) 59 F.(2d) 46, 47; Southern Surety Co. v. United States Cast Iron Pipe & Foundry Co. (C.C.A.8) 13 F.(2d) 833, 839; Day et al. v. Fireman's Fund Ins. Co. (C.C.A.5) 67 F.(2d) 257.

■ The assured fails to bring itself within this rule. Evidence that it was intended that the reduction of the limits of liability should not affect any employee of the assured injured during September, 1932, is entirely lacking. There was no consideration for any such agreement. If the higher limits were to apply during September, the premium should have been at the higher rate. The mistake the assured actually made was in failing to anticipate that one of its employees, injured during September, 1932, would eventually collect $15,000. That is not the kind of a mistake which equity will rectify. "It is not the province of a court of equity to undo a bargain because it is hard." Rutland Marble Co. v. Ripley, 10 Wall. 339, 356, 19 L.Ed. 955; Gavinzel v. Crump, 22 Wall. 308, 321, 22 L.Ed. 783. The assured failed to prove that it made a different contract from that expressed in the writing. Lumber Underwriters of New York v. Rife, supra, 237 U.S. 605, 610, 35 S.Ct. 717, 59 L.Ed. 1140. It only proved that a different contract would have been made if it had known that Adair would eventually receive $15,000. The contract expressed in the substituted indorsements was deliberately entered into on both sides. The parties stood on a footing of equality. There was neither obligation nor liability on either side beyond what was expressly stipulated. Grymes v. Sanders et al., supra, 93 U.S. 55, 63, 23 L.Ed. 798.

Let us suppose that the situation were reversed, that the original indorsements had provided for a limit of $10,000 for a single employee, and that on October 3, 1932, an indorsement had been substituted providing for a $25,000 limit effective September 1, 1932, in consideration of an increased premium from that date. Could any one reasonably contend that the Guaranty Company, under those circumstances, could escape liability for the settlement of $15,000 with Adair because it and the assured's officers were not advised of his injuries on October 3, 1932, when the indorsement providing for the higher limit was agreed upon? We think not.

The cases upon which the assured relies, namely, Steamship Samana Co. v. Hall (D.C.) 55 F. 663; Duncan v. New York Mutual Ins. Co., 138 N.Y. 88, 33 N.E. 730, 20 L.R.A. 386; Phenix Ins. Co. v. Kerr (C.C.A.) 129 F. 723, 66 L.R.A. 569; Home Ins. Co. v. Chattahoochee Lumber Co., 126 Ga. 334, 55 S.E. 11; Hollingsworth v. Germania Fire Ins. Co., 45 Ga. 294, 12 Am.Rep. 579; American Employers' Liability Ins. Co. v. Fordyce, 62 Ark. 562, 36 S.W. 1051, 54 Am.St.Rep. 305; Riegel v. American Life Ins. Co., 153 Pa. 134, 25 A. 1070, 19 L.R.A. 166; Southern Ins. Co. v. Williams, 62 Ark. 382, 35 S.W. 1101, we do not regard as applicable to this situation. They are cases in which courts refused to give effect to the cancellation of policies, where it appeared that both the insured and the insurer were ignorant of the fact that, at the time of the agreement to cancel, the contingency insured against had occurred. In most of the cases it was held that it was not the intention

of the parties to release the insurer's liability for past losses, but that the release affected only losses which might occur in the future. In several of the cases it was held that, the liability of the insurer having been fixed before cancellation, the insurer could not satisfy the obligation by the payment of some lesser amount upon an agreement to cancel. In none of the cases are the facts analogous to those out of which this controversy arises.

Here the agreement was that the limits of liability and the premiums were reduced as of September 1, 1932. The intention was plainly expressed. For the month of September, 1932, the insurance paid for by the assured was that with the reduced limits of liability. The injury to Adair had occurred in September, 1932, but no settlement was made with him until long after October 3, 1932. The extent of the assured's liability to Adair was unknown and undetermined on October 3, 1932. There was at that time no amount due from the Guaranty Company to the assured under the policy on account of Adair. By the time it was finally ascertained that the assured was liable for and would be required to pay $15,000 to settle his claim, the agreement reducing the limits of liability of the Guaranty Company was in force. When the Guaranty Company paid Adair $10,000, it had fulfilled its contract as modified by its agreement with the assured.

The judgment is affirmed.