503 P.2d 299

**Max J. COHEN, Plaintiff, Respondent and Cross Appellant,**

**v.**

**Kenneth H. MERRILL, Sr., and Jack Schild, Individually and d/b/a Tack & Hammer, a co-partnership, Defendants, Appellants and Cross Respondents,**

**J. A. MARTIN d/b/a J. A. Martin Agency, Defendant and Cross Respondent,**

**v.**

**BRYAN'S CAFE, INC., a corp., Intervener.**

**No. 10970.**

Supreme Court of Idaho.

Nov. 20, 1972.

R. M. Whittier, Pocatello, Idaho, for defendants and appellants, Merrill and Schild.

Robert C. Huntley, Jr., Pocatello, Idaho, for plaintiff, respondent and cross appellant Cohen.

William T. Goodman, Rupert, Idaho, for defendant and cross respondent Martin.

William A. Parsons, Burley, Idaho, for intervenor Bryan's Cafe.

BAKES, Justice.

Plaintiff, respondent and cross appellant Max J. Cohen, hereinafter referred to as seller, is a resident of Los Angeles, California, who owned two parcels of ground in Cassia County, Idaho. One parcel, hereinafter referred to as the garage property, was located on Lots 19, 20 and 21, in Block 105, of the original Burley Townsite. The other parcel, known as the cafe property, was located on Lot 22, in Block 120. The two parcels are approximately one block apart. Both the garage and the cafe property had been in the Cohen family for many years, and seller had inherited them from his mother. Until the year 1966, the garage property had been leased to the Handel Motor Company and the lease called for a $300 a month payment. After 1966 the Handel Motor Company moved out, and the garage property was rented occasionally at $100 per month and the property had been posted for sale for part of the time after Handel moved out. Seller had given an option to purchase the garage property to a Mr. Jensen in 1966 for a price of $35,000.00; however, the option was never exercised.

The cafe property had been leased to one Sprague since 1956. The lease was renewed to Sprague for an additional five years on June 12, 1964. The renewal lease gave the lessee the first right of refusal to purchase the premises in the event the lessor sold the cafe property. This lease was never recorded.

In 1963 Sprague subleased the cafe property to intervenor Bryan's Cafe, and in 1966 the Spragues assigned their entire leasehold interest in the cafe property to Bryan's, after first having obtained from seller an extension of the lease through December 31, 1974. Upon receipt of the assignment of the lease, Bryan's enlarged the cafe property building and did extensive remodelling at a cost in excess of $10,000.

The foregoing history provides necessary background in order to consider the effect to be given to the transactions which took place in the spring and summer of 1970 between seller and buyers. On April 6, 1970, defendant and cross respondent J. A. Martin, a Cassia County realtor, hereinafter referred to as realtor, wrote to the seller soliciting a listing on Lots 19, 20 and 21, in Block 105, and Lot 22 in Block 120. In the letter the properties were not described as the cafe and garage properties, but were described only by lot and block number. On or about April 14, 1970, the seller sent a letter to the realtor Martin which letter read as follows:

"AUTHORIZATION TO SELL REAL ESTATE                4–14–70

TO J. A. MARTIN AGENCY
1650 So Overland Ave, Burley, Idaho.

I, Max J. Cohen hereby authorizes you to sell Lot 19, 20, 21 on Block 105 and Lot 22 of Block 120 of Burley Townsite. My Price is $31,500 net, trusting that this is the information you want, thank you for your letter

Yours Very Truly

/s/ Max J. Cohen

Max J. Cohen

Los Angeles, April 14, 1970"

The realtor was familiar with the two properties of seller and was well aware that Lots 19, 20 and 21 in Block 105, was the garage property and that Lot 22 in Block 120, was the cafe property. suant to the above authorization, realtor Martin showed the cafe and the garage properties to defendants-appellants Kenneth H. Merrill, Sr., and Jack Schild, a partnership doing business as Tack & Hammer, herein referred to as buyers, and on more than one occasion realtor Martin

and the buyers were in the cafe property for meals or refreshments.

On July 8th, 1970, the seller wrote a letter to another realtor, a Mr. Preston, in the Cassia County area and authorized the sale of the garage property by Preston, the letter reading in part as follows:

"This is to confirm our conversation of last night. You may go ahead and offer for sale the garage property according to this agreement. I want $30,000 net."

On July 10, 1970, and again on July 13, 1970, Mr. James Annest, an attorney for the buyers, telephoned the seller and discussed the purchase of the properties which the seller had authorized the realtor to sell. No reference in that conversation was made to the cafe property as such. It was discussed that an earnest money agreement would be prepared and forwarded to the seller. On July 13, 1970, realtor Martin and Mr. Annest each wrote to the seller, and an earnest money agreement signed by the buyers was forwarded. This earnest money agreement described by legal description both the garage and the cafe properties, but no reference was made in either the letter or the agreement to the properties other than by lot and block numbers. The price listed in the earnest money agreement was $32,500. The seller signed and returned the earnest money agreement to the realtor and the realtor forwarded the $500 earnest money to the seller. Prior to signing the earnest money agreement the seller consulted with his Los Angeles attorney, Mr. David Hoffman. The record does not disclose that Mr. Hoffman was aware that there were two separate properties involved.

On or about July 21, 1970, attorney Annest prepared an "Option to Purchase Real Property" on behalf of the buyers, and forwarded it to the seller for his signature. The option was substantially in the same terms as the earnest money agreement except that it permitted cash payment of the total purchase price at any time. The seller took this agreement to his Los Angeles attorney, Mr. Hoffman, and at seller's insistence, certain language in the option agreement was lined out and initialed by seller. He thereupon signed it, and his attorney acknowledged his signature. The agreement was then sent back to the realtor who had the changes initialed by the buyers and then one copy was returned to the seller on about August 13, 1970. Nothing in the option agreement described the properties other than by lot and block numbers.

At the time that these negotiations were taking place, buyers were in the process of acquiring Lot 17 in Block 105 and were also negotiating with First Security Bank for the purpose of putting together a package sale of Lots 17 through 21 of Block 105 to bank. Eventually, buyers and the owner of Lot 18 of Block 105 made a joint offer to First Security Bank of $65,000 for Lots 17, 18, 19, 20 and 21 of Block 105, which offer was later accepted by the bank, and an earnest money agreement was executed between the buyers and the bank on September 4, 1970. The ultimate purchase price of those lots as broken down in the sale to First Security Bank was as follows:

| | |
|---|---|
| Lot 17 | $25,500.00 |
| Lot 18 | 8,000.00 |
| Lots 19, 20, 21 | 31,500.00 |

After executing the earnest money agreement with the bank the buyers then exercised their option with the seller, and by letter dated September 30, 1970, Mr. Annest, their attorney, advised seller that the buyers wanted to pay cash under their option and suggested that the transaction be closed by the Land Title & Escrow Company, Inc., which was also the closing agent under earnest money agreement between the buyers and the First Security Bank. Mr. Annest forwarded to the seller for execution a suggested warranty deed. On October 5, 1970, the seller signed and acknowledged the warranty deed sent him by Mr. Annest. It was forwarded to the Land Title & Escrow Co. which closed both the transaction between seller and buyers and the transaction between buyers and First Security Bank.

In the closing of the sale from the seller to the buyers, the only proration which occurred was of the taxes on the garage property which were prorated as of October 15, 1970. The taxes and fire insurance premiums on the cafe property were not mentioned in the closing. The rents on the cafe property were not prorated, nor was any request ever directed to seller to supply the buyers with a copy of the lease to Sprague on the cafe property. Neither the buyers nor anyone on their behalf contacted the lessees to determine the terms of the lease. The trial court took conspicuous note of this failure to discuss the essential elements of the closing of the sale of the cafe property in arriving at some of the conclusions which it did.

Some time after the transaction had closed, Mr. Annest, the buyers' attorney, visited the seller in Los Angeles and obtained from the seller the fire insurance policy on the garage property. At that time Mr. Annest acknowledged that the seller made some mention of the fact that he intended to purchase an annuity from the sale proceeds of the garage property and that in the course of discussing his retirement income made some mention of his income from the cafe property which "astounded" Mr. Annest, but Mr. Annest made no inquiry of the seller regarding his claim to any income from the cafe property, nor did he point out to him that the cafe property had been sold to buyers.

On October 26, 1970, the realtor Martin wrote a letter to the seller requesting the lease on "Lot 22 in Block 120" be returned to the title company so that the rents could be prorated. There was still no mention of Lot 22 as the cafe.

On October 30, 1970, Bryan's Cafe first learned of the sale of the cafe property to the buyers, and they advised their attorney of the sale. He wrote to the seller inquiring about the sale of the cafe property. Seller in his deposition states that this was the first knowledge he had that the documents covered the cafe property. Seller immediately called realtor Martin inquiring about Bryan's claim that the cafe property was included in the sale, and realtor Martin advised him that it was.

On November 23, 1970, seller commenced this action. Count One of the amended complaint alleges a mistake in including the cafe property in the transaction and further alleges that the defendants wilfully refused to correct the mistake allegedly made by the scrivener of the documents. Count Two alleges a cause of action against the realtor Martin alleging that he either mistakenly or intentionally included the cafe property in the transaction when he knew or should have known that plaintiff was only selling the garage property.

Depositions of all of the parties and the material witnesses were taken and based upon those depositions and the files and pleadings, the buyers moved for summary judgment against plaintiff. At the hearing on the motion for summary judgment on April 26, 1971, the record discloses that the attorneys for the buyers made the following motion:

"We would like to move to have all of the depositions published for the consideration of the court, the depositions of Max J. Cohen, Joe Preston, Jack Schild, James Annest, Vern Roberts, Kenneth H. Merrill, and James A. Martin, for the consideration of the court in considering this motion for summary judgment. We believe that the depositions taken have practically a complete transcript of what the testimony would be at the trial, and the record before the court will be rather complete."

The depositions had attached to them all of the material documents including the correspondence, agreements, deeds, and other documents involved in the transaction.

After hearing the arguments, the district court took the matter under advisement, and on May 12, 1971, issued a written opinion entitled "Decision on Motion for Summary Judgment" in which the court granted a summary judgment on Count One in favor of the plaintiff rather than the defendants, even though the plaintiff had not moved for summary judgment. In

the course of the decision, the trial court stated:

"The parties are agreed that all of the pertinent facts have been developed and are before the court. The only disagreements, on this motion for summary judgment, is that plaintiff believes the court should hear the witnesses so the rules of weight and credibility can be applied. I am of the opinion that the case is in a posture for decision, now."

The court concluded that:

"The conclusion is inescapable that the seller made a mistake—a mistake of which an unconscionable advantage was taken by or on behalf of the buyers. The conscious of equity is bruised."

The court then went on to point out how neither the buyers nor realtor Martin at any time discussed the cafe property throughout the transaction, particularly at the critical time of the closing when certain important legal matters should have been discussed, such as proration of taxes, insurance, and the terms of the existing lease on the property to Sprague (which was assigned to Bryan's Cafe) which lease materially encumbered the property.

■ While no findings of fact and conclusions of law were entered by the court, the court's decision indicates that the trial court felt that the buyers and the realtor Martin knew, or had reason to believe, that the seller was not intending to sell the cafe property and that by their actions they prevented seller from discovering the mistake which he had made in assuming that the legal description which was originally forwarded to him by the realtor Martin covered only the garage property.[1] Ordinarily such conduct would justify the granting of equitable relief. *See* Restatement, Contracts, Sec. 505; Williston on Contracts (3d Edition), Sec. 1573, p. 486; 17 Am. Jur.2d, Contracts, Sec. 146. The district

court concluded that the garage property was worth $31,500, although it was necessary to resolve conflicting evidence to arrive at this figure. The court then granted equitable relief and affirmed the contract for the sale of the garage property for $31,500 and rescinded the balance of the contract setting aside the transfer of the cafe property.

The buyers have appealed raising three assignments of error, first that the district court improperly resolved issues of fact in order to arrive at the summary judgment in favor of the plaintiff; secondly, that summary judgment should have been entered in favor of the buyers; and thirdly that the district court erred in affirming part of the transaction and in rescinding that portion of the transaction dealing with the cafe property.

■ The first issue which must be considered by this court is whether or not the matter was submitted to the district court for a summary judgment pursuant to Rule 56, or whether or not the matter was by agreement of the parties submitted on the records for his decision. As shown by the portion of the decision which is quoted above, the trial court assumed that the matter was submitted upon the depositions and pleadings, and thus proceeded to make certain evidentiary findings in that decision, although no findings of fact were formally entered. If is clear that if the matter was submitted for summary judgment, rather than submitted for final determination on the depositions, then the summary judgment entered by the trial court must be reversed because there were material issues of fact at issue,[2] such as the question of knowledge on the part of buyers and realtor Martin of the mistake which the seller had made in including the legal description of the cafe in the transaction, and the question of the valuation of

---

1. It is interesting to note in this regard that in his deposition the realtor Martin insisted that he was acting as agent for the buyers rather than for the seller, even though the trial court in its decision found, and we think correctly, him to be the fiduciary of the seller.

2. Straley v. Idaho Nuclear Corporation, 94 Idaho 917, 500 P.2d 218 (1972); Hansen v. Howard O. Miller, Inc., 93 Idaho 314, 460 P.2d 739 (1969).

the property, which the trial court resolved.

However, from the record before us we are unable to determine whether or not in the course of the proceedings on summary judgment the parties did stipulate to submit the case to the court on the record. Therefore, we are required to reverse the judgment of the trial court and remand this cause to the trial court to make a finding on the issue of whether or not in the course of the summary judgment proceeding the parties agreed that the matter should be submitted upon the depositions and files in the action, as was alleged by one of the counsel for the respondents at the oral argument before this Court. We are inclined to agree with the statement by counsel for appellant made at the commencement of the argument on the motion for summary judgment that the depositions contained "practically a complete transcript of what the testimony would be at the trial," and if the court finds from the record that the matter was agreed to be submitted upon the depositions, pleadings and other documents in the file, the district court should then enter findings of fact, conclusions of law and judgment accordingly as it views the matter. If the district court finds that the parties did not agree to submit the matter for disposition upon the depositions, pleadings and files, then the matter should be set for trial at the earliest convenience of the court and the parties.

Appellant's second assignment of error alleges that the court erred in failing to grant summary judgment in favor of the defendant buyers and against the seller. Suffice it to say that the record before the court raises factual issues regarding knowledge on the part of the buyers and realtor Martin concerning the mistake made by the seller Cohen, and these factual differences could not be resolved on a motion for summary judgment.[3]

Appellants' third assignment of error is rendered moot until such time as the trial court makes its findings.

Respondent argues that regardless of knowledge on the part of the defendant buyers, the unilateral mistake of fact of the seller in including the legal description of the cafe property in the documentation is sufficient in itself to justify rescission or reformation of the transaction between the seller and the buyers, thereby avoiding the factual issue of knowledge on the buyers' part. However, on other occasions this court has had before it instances of unilateral mistake and has refused to grant relief to the mistaken party.[4] Particularly in a situation such as this where the buyers have disposed of at least a portion of the property purchased, thus involving the rights of innocent third parties in some of the property, we are of the opinion that a seller who makes a mistake unilaterally cannot rescind or modify the agreement absent knowledge or reasonable grounds to know on the part of the buyer.

Regarding the cross appeal of seller Max J. Cohen alleging a right to exemplary damages against both buyers and realtor Martin, if upon rehearing as above ordered, the trial court finds that buyers or realtor Martin knew of seller's mistake and consciously took advantage of him, then the court shall determine the issue of exemplary damages under the standard set out in Cox v. Stolworthy, 94 Idaho 683, 496 P.2d 682 (1972), and Jolley v. Puregro, 94 Idaho 702, 496 P.2d 939 (1972).

The summary judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

McQUADE, C. J., and McFADDEN, DONALDSON and SHEPARD, JJ., concur.

3. Straley v. Idaho Nuclear Corporation, 94 Idaho 917, 500 P.2d 218 (1972); Hansen v. Howard O. Miller, Inc., 93 Idaho 314, 460 P.2d 739 (1969).

4. Moran v. Copeman, 55 Idaho 785, 47 P.2d 920 (1935); Milner v. Earl Fruit Co., 40 Idaho 339, 232 P. 581 (1925); Tatum v. Coast Lbr. Co., 16 Idaho 471, 101 P. 957 (1909); Moffett v. City of Rochester, 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108 (1899); Restatement of Contracts, § 503, p. 966; 17 Am.Jur.2d, § 145, p. 492.