In re JAY'S TRUCKING COMPANY, INC., Debtor.

S & J ASSOCIATES, Plaintiff,

v.

JAY'S TRUCKING COMPANY, INC. and Eastern Indemnity Company of Maryland, Defendants.

Bankruptcy No. 81–00936–A.
Adv. No. 81–0194–A.

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

Dec. 22, 1982.

Francis J. Pelland, Sadur & Pelland, Washington, D.C., for debtor.

Ken McFarlane Smith, Arlington, Va., for plaintiff.

Peter K. Stackhouse, Arlington, Va., for defendant, Eastern Indem. Co. of Maryland.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Bankruptcy Judge.

This case involves a dispute between a general contractor, S & J Associates, and an excavating subcontractor, Jay's Trucking, Inc., the debtor herein. The issue to be resolved is whether Jay's Trucking, Inc. ("Jay's") was required to perform "sheeting and shoring" in addition to its excavation work for the agreed contract price of $144,150.00.

The project for which Jay's became the excavating subcontractor is a maintenance and storage building at a water pollution control facility operated by Arlington County, Virginia. S & J Associates ("S & J") made the low bid for the prime contract in January 1981. Jack Trovato, the bidding partner of S & J, made the successful bid from calculations based upon subcontractors' bids received by telephone. Trovato testified that he used the lowest telephoned bid for the excavation work, $158,000.00 from Price Excavating Co., Inc., in arriving at his total bid of $2,546,000.00 for the entire project. S & J did not immediately execute a subcontract with Price Excavating, however, because the project required the participation of a minority contractor. S & J located a minority excavating contractor who bid the job at $149,000.00 but was unable to obtain the required bond. Richard L. Parker, who had bid the work for the minority firm, then informed Jay Saulsgiver, president of Jay's about the availability of the job and provided Saulsgiver with a copy of the specifications. Saulsgiver, in turn, contacted Sonny Johnson, also a partner in S & J, offered to "save him [Johnson] some money," and sub-

sequently agreed to do the job for $144,150.00.

Several weeks later, on May 6, 1981, the parties signed a written contract. This document called for Jay's to "complete the contract requirements for ... Section 2C, Excavation, Backfill, Fill and Grading...." Section 2C of the specifications for the project itemized the excavating work to be done and included "sheeting and bracing" to support the sides of excavations. A few weeks after Jay's had begun work, however, when Jay's refused to perform or assume responsibility for the sheeting and shoring, S & J terminated Jay's and subsequently retained Price Excavating to perform the excavation work, and Coastal Pile Driving, Inc. to perform the sheeting and shoring.

The parties do not dispute that the contract provides for Jay's to perform the sheeting and shoring. Rather, the issue is whether S & J reasonably could enforce the contract so as to compel Jay's to perform both the excavating and the sheeting and shoring for the contract price. It is Jay's position that, despite the language of the contract, Jay's never intended to perform any sheeting and shoring within the agreed price of $144,150.00, and that S & J knew or should have known that Jay's did not so intend.

It is well settled that the intent of the parties is the paramount consideration in interpreting a contract and that courts may inquire into all the circumstances surrounding its formation in determining that intent. 4B Michie's Jurisprudence of Virginia and West Virginia, *Contracts*, §§ 45 and 46 (1974). In particular, courts may examine evidence of the customs and usages of the trade in which the parties engage. 4B Michie's Jurisprudence, *Contracts* § 51.

At trial, Jay's introduced a carbon copy of its proposal to S & J dated March 4, 1981, in which Jay's had expressly excluded "any and all shoring or underpinning." (Exhibit A.) Both Jack Trovato and Sonny Johnson denied having seen this document prior to the trial. However, Charles Moore, who accompanied Saulsgiver to the office of S & J Associates in order to bid on the curb and gutter work, testified to having seen Saulsgiver prepare the proposal. Moore stated that Saulsgiver gave him the proposal to examine before presenting it to Johnson and that Moore had made a point of checking for the exclusion of sheeting and shoring. In addition, Jay's introduced trade payment breakdowns submitted by Jay's to S & J. These documents, which were furnished to S & J prior to the signing of the written contract between the parties, make no provision for performance of sheeting and shoring work by Jay's. Although Sonny Johnson also denied having seen these trade payment breakdowns prior to the trial, the Court finds credible the evidence presented by Jay's tending to show that the documents were in fact received by S & J.

Several witnesses testified that sheeting and shoring is a speciality and that the custom and usage of the industry is for excavators to do excavating work and for sheeting and shoring contractors to do sheeting and shoring work exclusively. Edward Sheafe, III, the bidder for Price Excavating who had placed a telephone bid with Jack Trovato on the day the prime contract was awarded to S & J, testified that he had orally excluded sheeting and shoring but that the written S & J memorandum recording his telephone bid of $158,000.00 fails to show the exclusion. Sheafe also stated that when Price Excavating later became the excavating contractor for the job, S & J did not ask the company to do the sheeting and shoring. The bidder for another company, which bid the job at $232,000.00, stated that his method of bidding was to itemize the services to be performed rather than indicate exclusions. This witness stated that he did not include sheeting and shoring; he felt no need expressly to exclude sheeting and shoring because the normal scope of excavating work is understood by industry custom, so that general contractors know what work they can expect excavators to perform.

Additionally, the Court notes that the bids received by S & J on bid day ranged from $158,000.00 to $239,000.00, all signifi-

cantly higher than the bid of Jay's and further that all of these bids excluded sheeting and shoring either expressly or by intent. Parker testified that the bid of $149,000.00 which he prepared for the minority contractor also excluded sheeting and shoring. When S & J executed new subcontracts, after terminating Jay's, it contracted in the amount of $249,000.00 for the sheeting and shoring and $143,000.00 for the remaining excavating. Therefore, the Court must find, in light of all the foregoing facts and the uncontradicted testimony regarding the bids by other excavators, that S & J knew or reasonably should have known that Jay's did not intend to do the sheeting and shoring work required on this project within its agreed contract amount of $144,150.00.

Nevertheless, Jay's signed a contract with S & J which committed Jay's to perform the work described in Section 2C of the specifications for the project. Clearly, this was a mistake on the part of Jay's. The action of Jay's in signing the contract as drafted did not comport with its intent regarding the work to be performed.

■ It often has been stated as a rule of law that there can be no relief from a contract on grounds of mistake unless the mistake was mutual. 3 *Corbin on Contracts,* § 608 (1952). The more modern rule regarding cases of mistake by only one party, however, is that the mistaken party may avoid the contract (1) if the mistake involved a "basic assumption" regarding the contract, (2) which mistaken assumption has a material adverse effect upon him, and (3) the other party had reason to know of the mistake. *Restatement (Second) of Contracts,* § 153 (1981); *see also,* 17 Am.Jur.2d, *Contracts,* § 147 (1964). Particularly, in construction industry cases in which a large discrepancy exists between the mistaken party's bid and the other bids for the same work, courts have afforded relief to the mistaken party. *Moffett v. Rochester,* 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108 (1900); *C.N. Monroe Manufacturing Co. v. United States,* 143 F.Supp. 449 (E.D.Mich.1956); *Kemp v. United States,* 38 F.Supp. 568

(D.Md.1941). Virginia courts also have afforded relief when "there has been a mistake of one party accompanied by . . . inequitable conduct" of the remaining party. *Shenandoah Valley R.R. Co. v. Dunlop,* 86 Va. 346, 351, 10 S.E. 239 (1889). Simple negligence in making the mistake has been held not sufficient to deny relief to the mistaken party. *Restatement (Second) of Contracts,* § 157 (1981) and cases cited in Reporter's Notes.

■ Alternatively, the Court notes that mutual assent to the terms is a basic requirement for the formation of a contract. In the absence of such mutual assent, if the parties intend different exchanges of performance, there is said to have been no "meeting of the minds" and, thus, no contract. *King Lumber Co. v. National Bank,* 286 F. 906 (4th Cir.1923); *Restatement (Second) of Contracts,* §§ 17 and 20; 17 Am.Jur.2d, *Contracts* §§ 18 and 146 (1964); 4B Michie's Jurisprudence of Virginia and West Virginia, *Contracts,* § 26 (1974).

■ The evidence in the instant case amply demonstrates that Jay's mistakenly executed the contract which on its face bound Jay's to perform sheeting and shoring, as well as excavating work for $144,150.00. The evidence further indicates that this mistake was due to inadvertence and that Jay's never intended to perform any sheeting and shoring work under the contract. In addition, clear and cogent testimony adduced at trial establishes beyond a reasonable doubt that S & J must be charged with the knowledge of what services Jay's intended to perform under the contract. Once S & J knew of Jay's mistake, as it must have known when Jay's contracted to perform all the work set forth in Section 2C of the specifications for less than half the reasonable price, S & J was under a duty to inquire further of Jay's as to its actual intent rather than attempt to snap up a clearly inequitable contract.

Accordingly, the Court finds that there was no meeting of the minds regarding the contract at issue and, thus, no valid contract existed between the parties. In addition, the Court finds that even assuming the

contract had been valid, the same would have been voidable by Jay's as containing a material mistake of which the other party knew or reasonably should have known.

Jay's, therefore, not having breached any contract is not liable to S & J for the difference between the contract price and the cost to S & J of having the work performed by others[1]. On the other hand, this Court makes no finding that Jay's was wrongfully terminated as excavating contractor. Rather, the relief granted herein is rescission only. Accordingly, Jay's is entitled to compensation in *quantum meruit* based on the reasonable value of the work it completed on the project. Jay's has computed the value of its work to be $29,304.00. In the absence of evidence demonstrating the propriety of a lesser amount, the Court accepts this figure as the reasonable value of the work completed by Jay's and will enter an appropriate award.

An appropriate Order will enter.

---

1. S & J Associates presented also in this case a claim for delay damages based upon testimony that the project, although incomplete at the time of trial, was 42 days behind schedule. S & J Associates failed to show, however, that the project could not be completed on time or that any of the alleged delay was attributable to action by Jay's.