# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-1431

_____

| | | |
|---|---|---|
| Assicurazioni Generali S.P.A.; AXA Global Risks, (UK) Ltd.; CGU International Insurance P.L.C.; Federal Insurance Company; Marine Insurance Company, L.T.D.; Terra Nova Insurance Company; Tryg-Baltica Int'l, (U.K.), Ltd.; Hiscox Dedicated Corporate Member, LTD, individually and on behalf of those certain underwriters at Lloyd's, London subscribing to Policy No. CD6186, | * * * * * * * * * * * * | Appeal from the United States District Court for the Western District of Missouri. |
| Appellants, | * * * | |
| v. | * * | |
| Black & Veatch Corporation; MEP Pleasant Hill, LLC, | * * * | |
| Appellees. | * | |

_____

Submitted:  November 20, 2003

Filed:   March 26, 2004

_____

Before LOKEN, Chief Judge, WOLLMAN and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Appellants, members of a syndicate of underwriters, appeal the district court's[1] entry of summary judgment in favor of appellees on claims for coverage under a maritime insurance policy. We affirm.

I.

Appellee MEP Pleasant Hill, LLC ("MEP") contracted with appellee Black & Veatch Corporation ("Black & Veatch") (jointly, "Appellees") to design, procure equipment for, and build a combined-cycle electricity generating facility near Pleasant Hill, Missouri. This construction effort was referred to as the Aries Project.

Black & Veatch contracted with Toshiba to manufacture Heat Recovery Steam Generators ("HRSGs") for the Aries Project. HRSGs are boilers that convert waste heat from gas turbines into processed steam for combined-cycle electrical generation. The components comprising the HRSGs were to be shipped by Toshiba from its facilities in Japan to the United States.

Appellants are members of a syndicate of underwriters at Lloyd's of London (collectively, "Underwriters"). Black & Veatch, through a broker, procured a policy for marine cargo insurance from the Underwriters. The policy offered two types of coverage. Section I provided, among other things, physical loss coverage for the transport of "equipment, machinery, supplies and materials." Section II included coverage for delay-in-start-up losses and for expenditures incurred to avoid or diminish such losses.

The parties agree that the policy established a "facility" or framework for insurance coverage, and that the facility did not, by itself, provide coverage for

---

[1]The Honorable Fernando J. Gaitan, United States District Judge for the Western District of Missouri.

-2-

specific projects. Instead, the risk for a project was added to the facility by way of declaration (or endorsement). Consequential loss coverage under Section II was available only in conjunction with projects selected for physical loss coverage under Section I, and only if the Underwriters specifically agreed to accept the risk on a project-by-project basis.

As an apparent means of managing the risk of consequential loss, Section II provided that certain "critical items" (presumably cargo) must be surveyed. The facility does not define "critical item." Section II provides: "Warranted critical items to be surveyed by LSA [London Salvage Association] or their appointees, or surveyors to be approved by Underwriters - as per warranty wording attached."

The attached "Survey Warranty Wording" states (with emphasis added):

Warranted the Salvage Association or its appointee, at the Assured's expense, *shall in respect of the items listed below*:-

1.    Approve vessel(s), tug(s), barge(s), towing arrangements, all other carrying conveyances and all lifting equipment including cranes required or loading/unloading operations.

2.    Approve all packing, loading, stowage, securing and unloading arrangements.

3.    Attend and approve all stages of handling during the transportation.

4.    Approve all transport operations including transport to vessel, voyage arrangements and transport from vessel to site.

5.    Approve prevailing weather conditions or stipulate acceptable weather criteria for handling and transit operations.

> And all recommendations complied with.
>
> *List of items: (If necessary to be listed on a separate schedule).*
>
> The Salvage Association to be advised of shipping schedules and any amendments and given all reasonable notice of required attendances in order that the above warranties can be complied with.
>
> Underwriters shall be entitled to receive any advices, reports or recommendations from The Salvage Association and/or its appointed surveyor.

No items were "listed below" in the Survey Warranty Wording, and no other document appended to the policy was denominated specifically a "separate schedule" of critical items.

Endorsement 5 added the Aries Project to the facility "in respect of marine cargo and consequential loss insurance cover." Endorsement 6 amended certain wording of the policy relating to the Aries Project. Both Endorsement 5 and Endorsement 6 include an effective date of April 18, 2000.

On July 20, 2000, a ship carrying certain HRSG components departed Japan for the United States. No survey had been conducted. On July 24, 2000, the ship was caught in a typhoon, which caused severe damage to most of the HRSG components on board.

Toshiba replaced the damaged HRSG components at no cost to Appellees. However, the replacements did not arrive at the Aries Project site until approximately six months after the originally scheduled delivery date. In anticipation of this delay, Black & Veatch changed the construction sequencing and employed additional labor and management in an effort to avoid delay in the start-up of the plant. As a result of these efforts, the deadline for completing the plant was met. Black & Veatch states that these efforts resulted in additional costs of $38 million for Appellees.

Black & Veatch and MEP submitted claims to the Underwriters for consequential damages and the expenses incurred to avoid the delay in start-up. The Underwriters denied the claims on the basis that no survey had been conducted.

The Underwriters filed a complaint in the district court seeking a declaration that the policy provided no coverage because of Appellees' failure to comply with the survey requirement. Appellees each filed counterclaims requesting a declaratory judgment that their losses were covered under the policy. The parties filed cross-motions for summary judgment on the question whether the Underwriters were liable under the policy. The district court ruled that no survey was required, and that the claims were covered under Section II of the policy. This interlocutory appeal followed pursuant to 28 U.S.C. § 1292(a)(3).

## II.

This court reviews a district court's grant of summary judgment *de novo*. We also review *de novo* a district court's interpretation of an insurance policy, which is a question of law for the court. *E.g., United Fire & Cas. Co. v. Gravette*, 182 F.3d 649, 654 (8th Cir. 1999). Disputes arising under marine insurance contracts are governed by state law, unless an established federal admiralty rule addresses the issue raised. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 316-21 (1955); *Yu v. Albany Ins. Co.*, 281 F.3d 803, 806 (9th Cir. 2002).

We conclude that state law governs the issues necessary to the resolution of this appeal, and the parties agree that the applicable state law is that of Missouri. Under Missouri law, the language in an insurance contract is to be given its plain meaning. *E.g., Shahan v. Shahan*, 988 S.W.2d 529, 535 (Mo. banc 1999). If a policy is unambiguous, then it is to be enforced according to its terms. *Id*. A court may resort to extrinsic evidence to guide its interpretation only if the policy language is ambiguous. *Aetna Cas. & Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707, 712 (8th Cir. 1992); *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261,

264 (Mo. 1973). The policy language will be viewed in light of the meaning that would ordinarily be understood by the party who bought and paid for the policy. *Krombach v. Mayflower Ins. Co.*, 827 S.W.2d 208, 210 (Mo. 1992) (en banc). "Language is ambiguous if it is reasonably open to different constructions," such as when "there is duplicity, indistinctness, or uncertainty in the meaning of words used in the contract." *Id.* (internal quotations and citation omitted).

At the outset, we believe the policy unambiguously states that a survey is required only for items contained in the "list of items" described in the Survey Warranty Wording referenced in Section II of the policy. The policy is also clear that this list of critical items must be included within the policy, and not in an ancillary document that is outside the written agreement. Section II provides that the "critical items" are to be surveyed "as per warranty wording attached." The "warranty wording attached" sets forth duties the salvage association shall perform "in respect of the items *listed below*." (emphasis added). The policy then provides a space for a "list of items," with a provision that "if necessary," the items are "to be listed on a separate schedule."

The reference to a "separate schedule" must be read in conjunction with the previous language stating that the critical items will be "listed below." This means the items will be listed within the same document -- perhaps on the same page if space permits, perhaps on a separate schedule that is made part of the agreement -- but after (or "below") the introductory language. No reasonable interpretation of the language would permit us to find that items listed on a separate document not incorporated into the contract were items "listed below" the introductory language. We thus reject the Underwriters' suggestion that a list of items set forth in a proposed Endorsement 7, which was never made part of the agreement, constituted the "list of items" contemplated by Section II of the policy.

The Underwriters argue the HRSGs were designated as critical items in Endorsement 5. As noted, Endorsement 5 added coverage for the Aries Project. It

provided that "with effect from 18 April 2000 the Aquila/Aries Project is included hereunder in respect of marine cargo and consequential loss cover." The Underwriters point to an attachment to the endorsement, which contains numbered points composed by the Underwriters, followed by Black & Veatch's responses.

The attachment includes the following language:

4. Supervision surveys required on critical items at both loading/discharge - details to be agreed once shipping schedule confirmed - costs for B & V's account.

[Response] We can arrange for these if required. Currently they are not required per our subcontracts. Only two contracts are shipping overseas: Toshiba from Japan HRSG and STG, BFP's and possibly motors from Europe.

. . . .

6. Rating indication is on the basis that total value of Cargo (DIC) does not exceed US$50,000,000.

[Response] Total value of all components may be larger that [sic] 50 million, but individually is less. Largest component is 24 million for HRSG which is made up of 10 separate shipments.

We have little difficulty concluding that Endorsement 5 does not constitute a "list of items" called for by Section II of the policy. In the attachment, Black & Veatch stated that a survey was not currently required under its subcontracts, and that it could arrange for surveys "*if required*." (emphasis added). Nothing follows, however, to demonstrate that the parties agreed that surveys *would be* required for any particular items. The non-committal reply by Black & Veatch put the onus on the Underwriters to gain agreement to a list of critical items if the Underwriters wished to oblige Black & Veatch under the terms of the policy to conduct a survey on

particular "items listed below."[2]  As Endorsement 5 contains nothing beyond the contingent statement that surveys could be arranged if required, we conclude that the endorsement neither constitutes a list of critical items, nor raises an ambiguity about the existence of such a list.

The Underwriters next argue that Endorsement 9 comprised a critical items list. In essence, the Underwriters contend that the parties agreed retroactively, by way of Endorsement 9, to subject the HRSG components to the survey requirement. Appellees claim they never received notice of this endorsement, and there is a factual dispute whether the broker who approved the endorsement was acting on behalf of Appellees when it did so.  For purposes of reviewing the grant of summary judgment, however, we assume the endorsement was made part of the policy.

Endorsement 9 contains the following language (with emphasis added):

21 August 2000

INFORMATION:

---

[2]Although we find this conclusion flows ineluctably from the text and structure of the agreement without resort to extrinsic evidence, we note that it is also consistent with the testimony of the Underwriters' designated representative:

> Q.  Who makes the determination of what is a critical item that needs to be surveyed under Section II coverage of this facility?  Is that a decision for you to make as the risk-taker or that is a decision to be made by the assured?

> A.  There's a notice of material actually on the assured to tell us what they're [sic] got *and there is a notice on us to say these are critical, these are not critical.*

(App. 89) (emphasis added).

Willis Limited were notified of a potential claim on this risk on 28 July 2000.

The items, parts for the HRSG were damaged by heavy weather on a voyage from Japan to USA. The extent of the damage is still unknown.

*It appears that these items, which were deemed critical to the project start-up, were not surveyed in accordance with the policy warranty.*

Leading Underwriters have reserved their rights and appointed Bateman Chapman.

We are not persuaded that Endorsement 9 creates the required list of critical items or an ambiguity regarding the obligation of Appellees to conduct a survey of the HRSGs. We agree with the Underwriters that in certain circumstances, parties may modify an agreement to affect the rights and obligations of the parties with respect to occurrences that pre-date the modification. In this case, however, we conclude as a matter of law that the post-typhoon endorsement is insufficient to create a "list of items" that had not been created as of the date of the loss.

It is doubtful that the plain language of Endorsement 9 can be read to modify the terms of the insurance contract. Unlike the other seven endorsements to the facility, Endorsement 9 does not state an effective date for an amendment to the policy. Unlike each of the other endorsements, it does not specify that "[a]ll other terms and conditions remain unaltered." These differences suggest that Endorsement 9 was not intended to alter the terms and conditions of the pre-existing agreement. Consistent with that inference, the endorsement is styled "Information," implying that it was an informational document rather than an embodiment of altered contractual terms. We are skeptical, therefore, that Endorsement 9, if effective, even creates an ambiguity in an agreement that previously did not include a list of critical items.

A more fundamental legal problem with the Underwriters' view of Endorsement 9, however, is that the endorsement is not supported by consideration.

"Since the modification [of an insurance contract] is contractual in nature, it follows that there must be consideration to support the obligation of each party thereunder, at least where the modification affects the coverage terms of the policy." 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 25:24 (3d ed. 1997). Our court, applying Missouri law, has refused to enforce a rider that excluded certain insurance coverage, holding that coverage "could not be taken away from the insured by mutual consent alone unsupported by consideration." *Wackerle v. Pacific Employers Ins. Co.*, 219 F.2d 1, 5 (8th Cir. 1955); *see also Southern Farm Bureau Cas. Ins. Co., v. United States*, 395 F.2d 176, 180-81 (8th Cir. 1968) (applying Arkansas law, "a limiting endorsement must be supported by consideration"); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 813-14 (6th Cir. 1999) ("It is axiomatic that any modification of a contract must be supported by both mutual consent and consideration.") (citations omitted). When our court has upheld enforcement of an endorsement that retroactively reduced limits of liability under an insurance policy, we did so *precisely because* the assured had received consideration in the form of reduced premiums. *Ruston Drilling Co. v. United States Fid. & Guar. Co.*, 81 F.2d 943, 945 (8th Cir. 1936); *see also GenCorp, Inc.*, 178 F.3d at 814-15 & n.14 (upholding post-loss modification of policy where "GenCorp received consideration for the change").

In this case, the retroactive addition of a critical items list would eliminate coverage for claims that are worth millions of dollars. For such a modification to be enforced, it must be supported by consideration. It is undisputed that there was no separate consideration for Endorsement 9. We thus conclude that the endorsement did not retroactively impose an obligation on Appellees to survey the HRSGs before shipping.

The Underwriters also rely on *Crown Center Redevelopment Corp. v. Occidental Fire & Casualty Co.*, 716 S.W.2d 348 (Mo. Ct. App. 1986), for the proposition that Endorsement 9 properly confirmed the pre-accident understanding of the parties that HRSGs were "critical items." *Crown Center* involved an insurance

-10-

dispute arising from the collapse of two skywalks at a hotel in Kansas City. An excess insurer, Columbia, argued that two injured parties (Hallmark and Crown Center) were not insureds under the Columbia policy, which incorporated the terms of a comprehensive general liability policy (the Occidental policy) that identified the insured parties. Columbia asserted that Hallmark and Crown Center were not insureds because an endorsement making them additional insureds under the Occidental policy was not issued until after the skywalk collapse.

The Missouri Court of Appeals held that Hallmark and Crown Center were insureds under the Columbia policy because "all of the evidence demonstrates that Hallmark and Crown Center were actually accepted by Occidental as additional insureds prior to the loss." *Crown Center*, 716 S.W.2d at 359. The court opined that there was "no doubt from the evidence that Hallmark and Crown Center were covered by the Occidental policy," and concluded that this pre-existing coverage was merely "borne out by the endorsement" that was issued after the loss. *Id.* at 359-60. Significantly, all parties to the key underlying policy in question -- Occidental Fire & Casualty and the two insureds -- agreed that Hallmark and Crown Center were insured prior to the loss. *Id.* at 359-60. It was only the excess insurer, whose policy incorporated the Occidental policy, who objected.

We do not understand *Crown Center* to dispense with the widely accepted rule that a modification of an insurance contract must be supported by consideration. Nor do we view the decision as license to conduct a freewheeling examination of extrinsic evidence to determine whether a post-loss endorsement, unsupported by consideration, was consistent with an intent of the parties not expressed in the written contract prior to the loss. The decision was very narrow: the Missouri court "expressly bas[ed] its holding on the fact that *undisputed evidence* demonstrated that Hallmark and Crown Center were actually covered by the underlying policy prior to the loss . . . ." *GenCorp*, 178 F.3d at 816 (emphasis added). To avoid summary judgment based on Endorsement 9 and the authority of *Crown Center*, therefore, the Underwriters must do more than identify extrinsic evidence that creates an ambiguity

-11-

about whether the parties intended the HRSGs to be "critical items" before the typhoon. *Crown Center* requires *undisputed evidence* that the post-loss endorsement reflects the pre-loss intent of the insurer and the insured. Whatever the relative strengths of the voluminous extrinsic evidence produced by the parties in this case, the pre-loss status of the HRSGs is not undisputed. Accordingly, we reject the argument that Endorsement 9 made consequential loss coverage unavailable to MEP or Black & Veatch.

## III.

What we have said thus far establishes that MEP enjoys consequential loss coverage under Section II of the policy. The Underwriters assert, however, that Black & Veatch may not recover, because only MEP is entitled to indemnity under Section II. This argument is premised on Endorsement 6 to the policy, which says, "It is noted that the DSU [delay-in-start-up] Limit of US$88,506,000 applies in respect of the interest of MEPPH [MEP] only." The Underwriters contend Endorsement 6 modified Endorsement 5, which they acknowledge had contemplated coverage under Section II for both parties.[3]

Black & Veatch argues that it does have coverage for consequential losses, but that even if Endorsements 6 means that only MEP is covered under Section II, then Black & Veatch is entitled to reimbursement under the Duty of Assured Clause of the policy. The Duty of Assured Clause provides:

---

[3]The attachment to Endorsement 5 included the following colloquy between the Underwriters and Black & Veatch:

> 3. Confirmation of total D.S.U. [delay-in-start-up] limit (i.e. is it to include both owners and B & V portion?).
>
> [Response] Yes it covers both owner [MEP] requirements and BVI [Black & Veatch] portion.

It is the duty of the Assured and their servants and agents in respect of loss recoverable hereunder to take such measures as may be reasonable for the purpose of averting or minimising such loss, and to ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised, and the Underwriters will, in addition to any loss recoverable hereunder, reimburse the Assured for any charges properly and reasonably incurred in pursuance of these duties.

The facility defines "Assured" as:

BLACK & VEATCH AND THEIR OFFICERS, DIRECTORS, EMPLOYEES, RELATED ENTITIES AND CONTRACTORS AND SUB-CONTRACTORS OF ANY TIER AND/OR THEIR PRINCIPALS AND/OR ASSOCIATED AND/OR AFFILIATED AND/OR INTERRELATED AND/OR SUBSIDIARY COMPANIES AND/OR CORPORATIONS AS THEY NOW ARE OR MAY HEREAFTER BE CREATED AND/OR CONSTITUTED, AND/OR FOR WHOM THEY MAY HAVE INSTRUCTIONS TO INSURE CONTRACTUALLY OR OTHERWISE, AS THEIR RESPECTIVE RIGHTS AND INTERESTS MAY APPEAR - HEREINAFTER KNOWN AS THE ASSURED.

According to Appellees, Black & Veatch spent $38 million to meet the scheduled completion date for the Aries Project despite the damage to the HRSGs. These efforts, they say, avoided an even greater amount of lost revenue to MEP that would have been caused by a delay in start-up. Consequently, Black & Veatch argues that it should recover its mitigation costs under the Duty of Assured Clause. The Underwriters, on the other hand, assert that Endorsement 6 means Black & Veatch is not entitled to indemnity under Section II, and thus could not impose additional liability on the Underwriters by mitigating losses for which Black & Veatch had no coverage.

We are persuaded that Black & Veatch may recover under the Duty of Assured Clause. A straightforward reading of the definition of "Assured," together with the Duty of Assured Clause, demonstrates that Black & Veatch is entitled to reimbursement. The facility declares that Black & Veatch is an assured, and

Endorsement 6 did not purport to amend the facility's definition of "Assured." An assured has a duty to take reasonable measures to minimize loss recoverable under the policy. Absent countermeasures, MEP would have suffered a loss recoverable under the policy due to a delay in start-up of the Aries Project resulting from the damage to the HRSGs. Black & Veatch took measures to minimize those losses.

We reject the Underwriters' contention that the Duty of Assured Clause only calls for an assured party to minimize losses that are recoverable under the policy by that particular party. We agree with the Underwriters that no reimbursement is available when an assured minimizes losses for which the insurer would not be liable *at all*. *See Cont'l Food Prods. v. Ins. Co. of N. Am.*, 544 F.2d 834, 837 (5th Cir. 1977); *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 489 (5th Cir. 1960). But the Clause at issue refers to minimizing "losses recoverable hereunder" without limitation as to which of the related assured parties recovers. Here, Black & Veatch minimized losses that would have been recoverable under the policy by its fellow assured, MEP. We are hard pressed to see how the Underwriters reasonably can claim that Black & Veatch had no duty to minimize losses under the policy that it procured, and instead should have left the Underwriters with even greater losses to pay.

## IV.

The Underwriters express great frustration that Appellees must have known that the HRSGs were "critical items," given the value and importance of the HRSGs to the Aries project, and the contemporaneous statements and actions of certain employees of Appellees. They characterize Appellees' contractual arguments as the afterthoughts of clever lawyers seeking to avoid what everyone knew or assumed about the status of the damaged cargo. The enforcement of contracts according to their unambiguous terms, however, serves an important purpose in the law. When the parties establish a clear mechanism for determining rights and obligations, lawyers and judges should not thereafter search through and interpret copious e-mail exchanges and deposition transcripts in an effort to discern whether the parties might really have intended that which they failed to articulate in the written agreement.

Where an agreement is clear, the parties are entitled to rely on an expectation that it will be enforced as written. In this case, we cannot gainsay the possibility that if the Underwriters had caused the HRSGs to be designated as critical items in an endorsement before the shipment occurred, then perhaps the Appellees would have taken special note of that formal designation and been influenced to ensure that a survey was undertaken. We need not speculate about such things, because the rules were spelled out clearly in the policy, and for whatever reason, the Underwriters did not take steps to ensure that a list of critical items was included in the policy before they assumed the risk of insurance.

The judgment of the district court is affirmed.

_____